THE STATE v. MARY JANE CROWSON.

*Evidence— Confessions—Judge's Finding of Preliminary Facts.*

1. The rule which excludes evidence of the confessions of persons charged with crimes, induced by the influence of hope or fear, embraces the *acts* of the parties as well as their declarations.

2. Whether the confession was obtained by such influences is a question preliminary to its admission, addressed to the Judge; and while his ruling, which undertakes to define the influence that controls its admission, and does so erroneously, may be reviewed upon appeal, his finding of the *fact* that it was or was not so obtained is conclusive.

3. If the case on appeal is silent on the point whether the Judge determined the preliminary question, in favor of life, it will not be presumed that he found the fact that the confession was not obtained by the influence of hope or fear.

(*State* v. *Vann*, 82 N. C., 631; *State* v. *Sanders*, 84 N. C., 728; *State* v. *Efler*, 85 N. C., 585, and *State* v. *Burgwyn*, 87 N. C., 572, cited).

INDICTMENT for murder, tried before *MacRae, Judge, at* Spring Term, 1887, of MITCHELL Superior Court.

The jury found the prisoner guilty of murder, and from the judgment thereon pronounced she appealed.

The prisoner is charged in the indictment with the murder, by drowning, of her infant son, of about the age of four years, and was found by the jury guilty of the crime. The testimony, in substance, was that about the middle of the ... day in January, 1887, the prisoner was seen with her child in her arms going down the public road, from which, at a point further on, tracks were afterwards found diverging towards the stream in which, some days later, the dead body was found. She returned the same day and was at the house of a witness, McKinney, without the child. To an inquiry as to what she had done with it, she replied that she had given it to Mr. Woods, whom she saw at Major Keene's with

some cattle; that she had taken it down to give to the latter, but it was too small, and he did not want it, and Mr. Woods said he would take it. The prisoner remained that night at the house of the witness, and her mother coming next morning, they left together.

The witness met prisoner a short time afterwards and told her that Mr. Woods did not have the child, and "if she could not show what she had done with it they would get after her about it." She then said that "she had not given it to Woods, but to a darkey from Virginia that used to work at Woods'," and that she did not know the darkey's name.

To this testimony the prisoner's counsel objected, and the objection was overruled and an exception entered.

On the next Sunday the witness and another, who had been watching the movements of the prisoner and her mother, fell in company with two others, Green and Phillips—Green being a deputy of the Sheriff—when a conversation again took place about the missing child, when witness said: "We told her (the prisoner) she had better show up what she had done with it." Four men besides witness were present. "We told her she had done something with the child, and she had *better show up* what she had done with it." He further testified as follows: "We told her at last that she *had to tell* what she had done with the child; and the deputy sheriff, Green, told her if she would take him to the place where she had lost the child he could tell with a crooked stick what she had done with him. Then we told her it *would be best for her to tell* what she had done with him," adding, "*come out and tell the truth about it and confess it all.*"

To this prisoner's counsel objected, and to its reception excepted.

The witness Green, after corroborating what the last witness said of the conversation with the prisoner, testified that she at first refused, but afterwards carried him to the river; that "she seemed very brave at first, but when she got to the

river became *much agitated* and *looked guilty;*" that he was acting as a detective, and believed that he could effect his purpose by the crooked stick; and the prisoner said: "If anybody wanted their negroes drowned to bring them to her."

There was much evidence offered of her feeble and low grade of mind, and of her capacity to distinguish between right and wrong, which it is not necessary to reproduce, since the question has been eliminated by the finding of the jury, under instructions of which no complaint was made.

*The Attorney General,* for the State.
*Mr. W. B. Council,* for the prisoner.

SMITH, C. J., (after stating the case). The only point upon which stress is laid in the argument of prisoner's counsel, and upon which the record calls on us to decide, is the competency of the evidence of the prisoner's act in conducting the officer to the brink of the stream where she last had the child, and to her remark about the drowning of negroes by herself.

These are most clearly confessions—the act as expressive as words could be—of her having carried her boy to the place whence it seems to have been cast into the water and there disposed of it.

It is not less apparent that these self-criminating facts were important elements in the proof of her guilt. The confessions, too, seem to be responsive, directly so, to the menace "that she *had to tell* what she had done with the child," and to what had been previously said to her, that "if she could not show what she had done with it *they would get* after her about it."

The confession, to be admissible, must be voluntary, and not obtained by the influence of hope or fear applied by a third person to the prisoner's mind, and this being, in its nature, preliminary to its being heard, is addressed to the

Judge, who admits or rejects as he may find the confession to have been superinduced by these motives. 1 Greenl. Ev., sec. 219. To the same effect are our own decisions. *State* v. *Vann,* 82 N. C., 631; *State* v. *Sanders,* 84 N. C., 728; *State* v. *Efler,* 85 N. C., 585; *State* v. *Burgwyn,* 87 N. C., 572.

These cases establish the doctrine also that while a ruling which undertakes to define the influence that excludes the confession, and does so erroneously, is the subject of an appellate revision, its exercise in bringing about the confession in a particular instance being a fact, is not subject to the corrective power of this Court.

Now, the reception of the testimony in response to the question objected to (and the objection must extend to the evidence which it elicits) may admit of two interpretations— one, that the receiving the evidence presupposes a ruling that it did not come from the influence brought to bear upon the prisoner; the other, that it was received without any determination of the preliminary question, actual or by implication.

In a matter so serious, involving human life, we feel constrained to adopt the latter construction of the action of the Court, and to consider this duty of the Judge to have been overlooked. He might have ruled out the confession, so damaging to the prisoner in its influence upon the jurors in conducting them to their verdict.

It is the well-merited commendation of our law that in its administration the same securities are provided for all who are accused of crime, and that all its requirements must be observed and a conviction had in subservience to them. Shocking as may be the act imputed, the guilt of the prisoner must be proved in accordance with the rules of evidence and upon a fair trial. This, in our opinion, she has not had, and she is entitled to a *venire de novo.*

There is error in the particulars pointed out, and the prisoner must have a new trial, and to this end the verdict must be set aside.

Error.