STATE v. JACK H. AMMONS and MARION (Alias ARTHUR) AMMONS.

(Filed 14 June, 1933.)

1. **Criminal Law I j—On motion to nonsuit all the evidence will be considered in light most favorable to State.**

Upon a motion as of nonsuit in a criminal action, made at the close of the State's evidence and renewed at the close of all the evidence, all the evidence, whether offered by the State or elicited from defendant's witnesses, will be considered in the light most favorable to the State, and it is entitled to every reasonable intendment thereon and every reasonable inference therefrom, and only evidence favorable to the State will be considered, the weight and credibility of the evidence being for the jury.

2. **Mayhem B c—Evidence of defendant's guilt of malicious castration held sufficient to be submitted to the jury.**

The direct evidence of the guilt of one of the defendants in this prosecution for malicious castration under the provisions of C. S., 4210, and the circumstantial evidence as to the other's participation and guilt is held sufficient to overrule their motions as of nonsuit.

3. **Criminal Law L e—**

The granting in the presence of the jury of the solicitor's motion to *nol. pros.* with leave as to some of several defendants will not be held prejudicial to the remaining defendants upon their appeal from a conviction, there being no objection by the defendants against whom the case was *nol. prossed* with leave.

4. **Criminal Law I g—**

The failure of the trial court to define the meaning of the term "reasonable doubt" in his charge to the jury in a criminal action is not reversible error in the absence of a prayer for special instructions.

5. **Criminal Law L e—Exclusion of testimony in this case held not prejudicial.**

Where in a prosecution for malicious castration defendant's physician, offered as a witness, has been allowed to testify as to defendant's weak physical condition, the exclusion of his testimony as to the diseases with which defendant was suffering will not be held prejudicial although defendant had testified as to them, the defendant when he became a witness being as other witnesses and subject to the same rules.

APPEAL by defendants from *McElroy, J.,* at November Term, 1932, of BUNCOMBE. No error.

The defendants, Jack H. Ammons, Marion (alias Arthur) Ammons, Walter Yarborough, Sam Todd and A. D. Cordell, were indicted in a bill of indictment containing three counts: (1) charging the defendants with castrating the prosecuting witness Johnnie Hart; (2) secret assault; (3) felonious assault. A mistrial was ordered by the court as to the defendants Yarborough, Todd and Cordell, and the solicitor as to them took a *nol. pros.* with leave. The defendants Ammons were convicted under the first count in the bill of indictment and sentenced by the court below.

Johnnie Hart, a witness for the State, testified to the effect that he was 26 years old, lived in Biltmore, N. C., and was married. On Monday, 7 November, 1932, 20 minutes to 12 o'clock he was castrated. "I left and went toward my home, walked up the paved road to the end of a warehouse on a side track. I then went to the woods to get me a load of fire wood. . . . In two or three minutes I was grabbed. *Jack Ammons was on the side of the path along which I was walking in the woods, he grabbed me by the left wrist. Somebody hit me on the head.* I don't know what Jack Ammons had in his hands, *it looked like a knife.* As he grabbed me I was hit in the head. I could not see who hit me. I didn't turn around. They threw something over my head that I couldn't see through. I fell to the ground, and after I fell somebody tore my shirt off and crammed it in my mouth. I could not holler. They were laying on me, kinder, and had my legs tied. They started to work on me. Started to work in my legs. *I felt the knife strike me, it struck me on my private parts.* This lasted just two or three minutes. They then got off of me and left."

Guy Roberts, a deputy sheriff, witness for the State, testified in part: "A call came into the sheriff's office about 12:30 o'clock Monday, 7 November, and in response to this call I went to Taylor's house out in the Oakley section. I must have got there by 1 o'clock, p.m. *I found Johnnie Hart in a chair in a bloody condition.* I found the overalls that he had changed from in a very bloody condition. I then brought Johnnie Hart to the hospital, in a car and after I brought him there I went back out to Taylor's. I talked to Johnnie Hart some, but he seemed to be suffering so that I didn't talk to him much. He went unconscious in the car. *I went back out to Taylor's house, and went to the woods where I understand this happened. I found the testicle lying in the woods, and also found blood on the leaves. It looked like there had been a struggle there.* The solicitor: Mr. Roberts, I hand you this handkerchief and ask you to state what it is, and where you found it? Answer:

I found this in the woods. . . . Johnnie said he went through the woods to pick up some wood to carry home and that Jack Ammons was along the trail and he reached out and grabbed him by the left wrist and he seen a knife in his hand. Jack jerked him down and about that time somebody struck him in the back of the head and threw something over his face and crammed something in his mouth. Then he said there was one on each side laying across him holding him down and somebody held his legs. . . . I arrested the defendant, Jack Ammons. I took a knife from him. Q. What did Arthur or Marion Ammons say about being with Jack on the day of the cutting? Answer: *He said he came to Jack's house that morning about 7 o'clock and he had been with Jack until they came to Jack's house after this happened over there,* and Jack went back, borrowed a shot gun and went back there. When I arrested Marion Ammons at Jack Ammons' house he said that his brother brought him to Jack Ammons' house about 7 o'clock from Woodfin. He is an escaped prisoner and he said he understood the law was looking for him in Woodfin and he decided it was safer there and he had been with Jack ever since. . . . The handkerchief that I identified was not found at the scene of the cutting, but was found in the woods a distance of about one hundred and fifty (150) yards away."

The State then offered in evidence the handkerchief identified by the witness Roberts, and *which contained the initial "A" in the corner,* and which was dirty, but contained no blood. The State then offered in evidence *two knives identified by the witness Roberts as being taken from the person of the defendant, Jack Ammons, at the time of his arrest, one of which contained a dark stain on the blade.*

Zetta Mae Jones, a witness for the State, testified in part: "I know where the woods are that it is said that this cutting took place. I know the time that they say the cutting took place. I was at home at that time. I know Jack Ammons. I saw him that day. Saw him come down the railroad. *Someone that looked like Marion Ammons (pointing him out in the court room) was walking with him. They were walking pretty fast. The man with Jack Ammons had on a brown suit. It was between 12 and one o'clock p.m. that I saw them."*

Ernest Pack, a witness for the State testified, in part: "I saw him go up a bank to leave, going towards the railroad there where he used to live. I know where the old 'Cheesborough Spring' is, *it is up in the woods in the direction towards where Johnnie got cut.* I know Jack Ammons, and have known him for sometime. *I saw Jack Ammons that day and Marion Ammons that man (pointing to Marion Ammons in the court room) was with him.* I was walking along the railroad track, and I saw them coming up a path. *It was about 12:30.* They came up

on the right-hand side of the railroad track in the direction I was going. . . . Jack Ammons asked me if I knew anything about when a freight train would run, and I told him not until later on in the evening about 4 o'clock. . . . When I saw Jack Ammons and Marion Ammons they were coming down a path which is on the right-hand side of the railroad going east. This path runs from up near Jack Ammons' house."

Thurman DeWesse, a deputy sheriff, witness for the State, testified in part: "I went to the place where they said Johnnie Hart got cut. . . . investigated the place and noticed that there had been a scuffle there."

The defendants denied their guilt, and set up an alibi. Both went on the stand as witnesses. Arthur Ammons, one of the defendants, testified, in part, on cross-examination: *"That knife there, that was taken off of Jack Ammons, is one that I gave him.* I got it from a fellow in Dallas, Texas, swapped him a pair of pants for it. Yes, I have been pretty much all over the country. I just set around with Jack Ammons at his house that day and talked. Yes, he knew I was escaped from the chaingang. No, I didn't hit Johnnie Hart in the head with anything, and didn't help Jack Ammons cut him. *I know that Jack wasn't in these woods over there, because I was with him all that day."*

Defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The necessary facts and exceptions and assignments of error will be considered in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*Edward H. McMahan for defendants.*

CLARKSON, J. The defendants, in the court below, made motions to dismiss the action or for judgment as of nonsuit, at the close of the State's evidence and at the close of all the evidence. C. S., 4643. The court below overruled these motions, and in this we can see no error.

"On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. 'An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' *S. v. Earp,* 196

N. C., 164, 166. See *S. v. Carlson,* 171 N. C., 818; *S. v. Sigmon,* 190 N. C., 684. The evidence favorable alone to the State is considered—defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility, the weight, effect and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899." *S. v. Lawrence,* 196 N. C., 562, 564.

The first count in the bill charges a violation of C. S., 4210, which is as follows: "If any person, of malice aforethought, shall unlawfully castrate any other person, or cut off, maim or disfigure any of the privy members of any person, with intent to murder, maim, disfigure, disable, or render impotent such person, the person so offending shall suffer imprisonment in the State's prison for not less than five nor more than sixty years."

As to defendant Jack H. Ammons, the evidence of the prosecuting witness, Johnnie Hart, is direct that there were two and that he was one of them that perpetrated the crime.

As to the defendant Marion (alias Arthur) Ammons, he admitted that he "came to Jack Ammons' house that morning about 7:00 o'clock and he had been with Jack until they came to Jack's house after this happened over there." The evidence was also to the effect that Jack Ammons at the time of his arrest had two knives on his person—one of which contained a dark stain on the blade. One of the knives Arthur Ammons had given Jack Ammons. There was other circumstantial evidence. We think the evidence sufficient to be submitted to the jury, the probative force was for them to determine.

The record discloses: "The defendants, Walter Yarborough, Sam Todd and A. D. Cordell, rest and renew their motion for judgment as of nonsuit. The court intimated that it would sustain the said defendants' motion for judgment of nonsuit, whereupon, the solicitor for the State requested the court to declare a mistrial as to the three said defendants. The mistrial was ordered, and the solicitor for the State announced that he would take a *nol. pros.* with leave as to the defendants, Walter Yarborough, Sam Todd and A. D. Cordell. All of this procedure took place in the presence of the jury. The defendants, Jack Ammons and Marion Ammons objected—objection was overruled, and the defendants, each of them, excepted. To the ordering of a mistrial as to the three defendants tried jointly with the two defendants herein appealing, without declaring a mistrial as to all of the defendants, the defendants, Jack Ammons and Marion Ammons, objected—the objection was overruled and the said defendants excepted. The said Jack Ammons and Marion Ammons then moved the court to order a mistrial as to their cases. The motion was overruled and the said defendants

excepted." We think these exceptions and assignments of error cannot be sustained. It will be noted that the defendants Yarborough, Todd and Cordell took no exception to this procedure. The effect of the order made by the judge as to Todd, Cordell and Yarborough was simply that of a *nol. pros.* which could be taken at any time, and the defendants, Jack and Marion Ammons were not prejudiced by it. · The record does not disclose that there was any order withdrawing a juror. Nobody could complain of the manner in which this was handled except the defendants, Yarborough, Todd and Cordell, and they acquiesced. So far as these appealing defendants are concerned, the trial was not legally disturbed or interrupted. See *S. v. Ellis,* 200 N. C., 77.

The defendants excepted and assigned error that the court below did not define "reasonable doubt to the jury." This cannot be sustained.

In *S. v. Johnson,* 193 N. C., 701, at p. 704, we find: "The cases last cited are also decisive authority for overruling the prisoner's exception to the instruction on the question of reasonable doubt. The instruction did not attempt a definition of the term, and this the prisoner assigns for error, although he made no request and tendered no prayer for a particular formula or a more comprehensive definition. *S. v. Lane,* 166 N. C., 333."

We see no prejudicial error in the exclusion of the testimony of Dr. Geo. Floyd Ross, as to what disease or illness Jack Ammons was suffering with. The record discloses: "The court: I let him state whether or not he is a strong man or a weak man physically. Witness: Jack Ammons is in a very weakened physical condition." Defendants, when they became witnesses and testified, were as other witnesses, and subject to the same rules.

We have examined the record and charge of the court below with care and we can see no prejudicial or reversible error. The charge of the able and learned judge covered some 14 pages. The crime was defined, the burden of proof as to reasonable doubt was placed on the State, covering every ingredient of the crime and was fully explained to the jury. The definition of "aider and abetter" was properly defined. The jury could find one or both guilty or not guilty. "If you find Jack Ammons not guilty then it follows as a matter of course that you will find the defendant Marion Ammons not guilty." The law applicable to the facts was fully set forth and the contentions of the State and defendants fairly given. In law we find

No error.