DEVIN, J., took; no part in the consideration or decision of this case.
Criminal prosecution, tried upon indictment (1) charging all of the defendants, in the first count, with conspiracy to dynamite certain buildings or structures in Alamance County; (2) charging four of the defendants, J. P. Hoggard, Tom Canipe, J. F. Haraway, and Florence Blaylock, in the second count, with feloniously breaking into a storehouse with intent to steal and carry away a quantity of dynamite; (3) charging four of the defendants, J. P. Hoggard, Tom Canipe, J. F. Haraway, and Florence Blaylock, in the third count, with the larceny of a quantity of dynamite of the value of $25, the property of Kirk Holt Hardware Company; (4) charging five of the defendants, John L. *Page 775 
Anderson, J. P. Hoggard, Tom Canipe, J. F. Haraway, and Florence Blaylock, in the fourth count, with feloniously receiving the said quantity of dynamite knowing it to have been feloniously stolen or taken; (5) charging two of the defendants, Florence Blaylock and Howard Overman, in the fifth count, with feloniously attempting to dynamite a certain building, the property of Stevens Manufacturing Company; (6) charging two of the defendants, Florence Blaylock and Howard Overman, in the sixth count, with feloniously attempting to dynamite a certain building, the property of E. M. Holt Plaid Mills, Inc.
CHRONOLOGY OF THE CASE.
When the case was called for trial, Jerry Furlough entered a plea ofnolo contendere to the first count in the bill, which was accepted by the State, and a nol. pros. with leave was taken as to him on the other counts.
MOTIONS AND RULINGS PRIOR TO TRIAL.
Before the jury was selected and impaneled, all of the defendants, except Jerry Furlough, moved to quash the bill of indictment, on the ground that it charged different offenses against different defendants, and that they were entitled to separate trials. Overruled; exception.
Thereupon, all of the defendants, except Jerry Furlough, entered pleas of "Not guilty."
The defendants then moved that none of the jurors summoned be called, but that the sheriff should call bystanders without regard to whether they had been summoned or not, and also that those already in the box be taken out and replaced by having the sheriff call jurors from bystanders. These motions were based upon the fact that no talesmen had been drawn from the box, and no order was made to summon special jurors in open court, or at the beginning of the term, and that no request was made by the defendants for the sheriff to summon such jurors.
Overruling these motions, the court made a finding of facts that immediately upon the adjournment of court on Tuesday, 27 November, the solicitor approached the court and stated there were numerous defendants in the case he proposed to call the next morning, suggesting to the court that additional jurors be called, and as there was only one panel of jurors, the court instructed a deputy sheriff to summon 15 to 18 men to serve as talesmen, good men, of good moral character, who had paid their poll taxes, to appear the next morning.
Before the jury was impaneled, the court dictated to the reporter the following entry for the record: "At the time the jury was impaneled, the defendants Anderson, Canipe, and Haraway had four unexhausted challenges, and the defendants Overman, Kimrey, and Blaylock had eight unexhausted challenges." *Page 776 
The case had its beginning with the throwing of dynamite into the plants of the Stevens Manufacturing Company and E. M. Holt Plaid Mills, Inc., of Burlington, during the nation-wide textile strike on Friday night, 14 September, 1934. The following day, about noon, four sticks of dynamite, tied together at each end with two strings, with a fuse in them, were found under a loom in the Stevens Manufacturing company. The night watchman testified that between 3 and 4 o'clock on the night of 14 September, a Ford roadster, with two men in it, stopped in front of the mill, and one of them lighted something at the car, and then threw it. Two witnesses for the State testified that about 3 a.m. on the morning of 15 September, a Ford roadster speeded from the direction of the Stevens Manufacturing Company, a quarter of a mile away, and stopped after going a short distance along the road next to the E. M. Holt Plaid Mills. Shortly thereafter, an explosion was heard, and a large number of window lights were shattered and jarred out, about 150. On the following day four sticks of Red Cross dynamite were found lying by the side of a fence at the old furniture plant in Burlington.
On the night of the explosion at the E. M. Holt Plaid Mills plant, a Ford roadster automobile with a khaki top, owned by R. H. Snyder, was stolen from the street in front of his residence in the North Carolina Silk Mill village, and the next morning, after the bombing, it was found abandoned in the woods about three miles away. Three gallons of gas had been consumed, and marks on the dash-board indicated that several matches had been struck thereon. There were also a few strings and a piece of cloth found in the car which were placed in evidence along with certain strings found attached to the dynamite.
For several years the Kirk Holt Hardware Company had maintained a storehouse for dynamite, about a mile from Burlington. It contained a number of cases of dynamite up to the time of the day previous to the bombing, when it was found that the door had been broken open, the staple sawed, and the lock taken off. An investigation by the sheriff showed five different-sized tracks (two inside the dynamite house) leading down the road to a Studebaker automobile, owned by Lee Rumple, sitting in a ditch, with tracks in front and in the rear, also signs indicating that a car had been in front and another in the rear. There had been a rain during the first half of the night, the car in front having left before the rain, and the one in the rear after the rain. Tracks inside the house were compared with tracks in front of the Studebaker, and found to have been made by similar-sized shoes. T. M. Hundley, on the night previous to the bombing, was called to help Lee Rumple *Page 777 
pull the Studebaker car out of the ditch. He found a Chevrolet automobile sitting behind the Studebaker and in it three of the defendants, Hoggard, Haraway, and Canipe. There were two others who were not identified. There were also two other occupants of the Studebaker. Having failed to get the Studebaker out of the ditch, Hundley took its occupants with him and left in the Chevrolet. Hoggard, Haraway and Canipe admitted on the trial that they were there at the time, having gone in Canipe's car to Belmont, looking for liquor, but there was evidence by a policeman that Hoggard and Canipe claimed to be the only persons present.
On the night of the bombing the defendants Blaylock and Overman were seen together in a cafe in the North Carolina Silk Mill village. Later, Overman told the sheriff he had not seen Blaylock that night. Blaylock said they were together and went out looking for liquor, then going home about 10 o'clock.
Blaylock told Charlie A. McCullom, witness for the State, that "I am the man that throwed the dynamite in the Plaid Mill," and that Howard Overman drove the car. Howard Overman, in an alleged written confession, signed in the presence of several special officers or detectives, after having taken a couple of drinks, said he met Blaylock and after roaming around until midnight he drove the car and Blaylock threw some dynamite, on this trip, at the Stevens Mill and some at the Plaid Mill, one going off and the other not. This alleged confession was made in a cabin rented by S.E. Howard, and in the presence of several special officers who, with one exception, had been brought in from Pennsylvania to investigate the dynamiting of the mill. The alleged confession, admitted only as against Overman, was attested by these special officers or detectives, as having been made in their presence, but Overman testified he thought he was signing a paper to get it straight about an automobile which had been stolen.
On Tuesday night following the bombing the defendant Anderson told the State's witness Pruitt that he, Anderson, wanted him to make a trip for him, this being in the Labor Union hall in Burlington, and a little later the defendant Furlough also told him he wanted him to make a trip, but when he said Anderson wanted him to make a trip also, Furlough said he could wait until later in the night. Later in the night Anderson got in Pruitt's car. They went by defendant Hoggard's house and borrowed a flash light. (After Hoggard's arrest he asked the witness not to mention anything about the flash light.) Anderson directed the car until they arrived at a farm in Guilford County owned by Anderson's mother-in-law. Anderson got out and in a few minutes returned with four sticks of dynamite, wrapped in a handkerchief, the sticks being tied with a piece of light-looking string. Returning by a *Page 778 
different route, when near Burlington, Anderson got out, hid the dynamite, according to the State's witness, and marked the location, stating that he wanted Pruitt, when he got to the half, to get Jerry Furlough and bring him back and show it to him. Upon their return to the Union Hall, Anderson told Furlough, in Pruitt's presence, that Pruitt would show him where the dynamite was, and Furlough said, "If he was going to do the job that he would have to have a pair of gloves." On the same night, Pruitt took Furlough and defendant Kimrey to Furlough's home, both Furlough and Kimrey saying that they had dynamite caps and fuse, and Furlough stating that "he was to pull the job at the Duke Power plant, because he was an electrician." They returned to Union Hall, and Furlough got a pair of gloves upstairs, and a dynamite fuse from behind a coal sack. They started out towards Haw River, Pruitt, Furlough, and Kimrey, in Pruitt's automobile, and when another automobile drove up behind them, Pruitt drove the car into a driveway, and Furlough threw the fuse out of the car. They went back to Union Hall, and later in the night, Pruitt went back for the fuse, taking it to Union Hall. The next morning the same three went to the spot where the defendant Anderson placed the four sticks of dynamite on Tuesday night, and moved it to a place near Glen Raven, about a quarter of a mile from the Duke Power plant, hiding it; and this dynamite was later found by the officers at another place.
After some of the defendants had been arrested, Anderson told Pruitt "he was afraid they would squawk and would tell where it was," after they had started on another trip to the farm in Guilford County, this time to move the dynamite from a sawdust pile, carrying it two or three hundred yards up or down a creek and concealing it in a hollow. Later, the officers were conducted to this place by Pruitt. The 96 sticks of dynamite found were Red Cross dynamite, and the four sticks found near the Duke Power plant were of the same kind. Pruitt also said that on one occasion Anderson remarked he would like to have someone place some dynamite under the house of Mr. Copeland, one of the owners of the Plaid Mills, and that if this were done, they would give the information to the officers, leaving the impression that it was an inside job. On Saturday night after the bombing defendant Blaylock asked about some dynamite caps the Porter boys were to bring R. A. Rowe, and on Monday he asked Frank Porter about some dynamite caps, stating he wished to kill some fish, the said Porter being then engaged in digging wells.
Jerry Furlough testified Florence Blaylock asked for the loan of a hacksaw several days before the bombing, and also stated that he was taking two cases of dynamite home. Furlough said he was in the Union Hall the night Anderson asked Pruitt to make a trip for him, and that Anderson told him Pruitt would take him to get four sticks of dynamite. *Page 779 
When he reached home he got three dynamite caps. Before setting out on the trip, he said he had an understanding that they would go to Mr. King, who would set his watch ahead, so as to establish an alibi for them. When Kimrey, Pruitt, and Furlough started on this trip, it was their intention to blow up the Duke Power transformer, according to Furlough. Anderson had not said when they were to do the job, but did arrange for them to get the dynamite. Furlough said they got scared when they found another car following them, and went back to the Union Hall, throwing the fuse into an alley. They went out the next morning to hide the dynamite. Later in the day Hoggard asked Furlough, "What is the matter, have you got scared?" and Anderson said, "If you are going to do that job, you had better hurry up." Furlough, after going home, decided to move the dynamite to a place which Pruitt and Kimrey wouldn't know about, and never said anything more about it until he went with the officers to find it. He said Anderson told him and Kimrey that they were to do the job. There was evidence of conversation between the defendants Anderson, Blaylock, Furlough, and Kimrey as to how the Duke Power plant was to be blown up.
On the morning the defendant Hoggard was arrested, Charlie McCullom, State's witness, testified Hoggard told him: "Jerry Furlough has turned us up. We are going to make him take the last day of it. We are going to pack it on him." McCullom said defendant Blaylock had one time told him that he had come out with two cases of dynamite, and Hoggard came out with one, but later told him two fellows from High Point got the dynamite. McCullom testified defendant Anderson, when informed by him that some of those in jail had squawked, said: "Florence Blaylock can't squawk; he is the man that done the work at the Plaid Mill because I was right up the line with him." Anderson also told this witness: "I know they won't get the dynamite, I took the damn thing thirty miles from here and hid them." This statement was made after the defendant Hoggard had been arrested the second time. Hoggard, after being told of the statement by Anderson, said he told the latter Pruitt would not do to trust, not to take him with him, but that "he (Anderson) had taken him right where the dynamite was." Anderson told this witness "they don't know nothing," after being informed that "they are going to get you every one to a man."
Anderson was president of the Labor Union Council, of which the Burlington Local Labor Union was a member; the defendant Pruitt was engaged at the Burlington Labor Union Hall to drive his automobile; the defendant Furlough was on picket line duty; the witness McCullom was on a committee in charge of food supplies, and the other defendants were either members of the union or frequented the Labor Union Hall. *Page 780 
There was introduced in evidence the four sticks of dynamite found at the Stevens Manufacturing Plant, 96 sticks found on the farm of Mrs. Holt, mother-in-law of defendant Anderson, the fuse identified by Furlough as the fuse he had on the night in question, and a box of dynamite caps which Furlough testified he had in his possession.
J. H. Vickery testified for the defense that he and O. R. Holder went to Gray's Chapel on Monday, 17 September, to look for a lost dog, and they saw a Ford car stopped on the side of the road, two men standing by it, one of whom asked for a tire pump, after waving him down, and said to the other fellow to get me a valve core, or a valve, and the other fellow stepped into the car and picked up something. When he did, the man outside the car said, "Be damn careful with that — you know that's dynamite." They fixed the tire and drove off. H. F. Pruitt was identified as one of the men. The other was not John Anderson, the witness said. Vickery was corroborated by Holder. Pruitt, recalled to the stand by the State, denied he ever saw either Vickery or Holder before seeing them in the courtroom.
There was much evidence on behalf of the defendants in denial of the State's case, and some undertook to show that they were elsewhere when the crimes charged against them were committed.
MOTION TO STRIKE ALLEGED CONFESSION.
After the evidence was all in, the defendant Howard Overman lodged a motion that his alleged confession, previously admitted, be stricken out and withdrawn from the consideration of the jury on the ground of involuntariness, it appearing from the testimony of D. P. Stewart, a witness for the State, that the following statements were made at the time: "I think I told him some of the ones in jail had talked and would talk and he might as well do likewise. . . . It was not true that anyone in jail had talked. . . . I believe I told him it would be better for him to go ahead and tell it just like it was and he might as well go ahead and tell it because it was already told." Motion overruled; exception.
DEMURRER TO EVIDENCE.
At the conclusion of the State's evidence, and again at the close of all the testimony, the defendants moved for judgment of nonsuit under the Mason Act. Overruled; exception.
OBJECTIONS TO EVIDENCE AND THE CHARGE.
There were numerous exceptions to evidence and a number to the charge. *Page 781 
VERDICT.
The jury returned the following verdict: "Guilty as to all."
Motion by defendants, other than Avery Kimrey, to set aside the verdict. Overruled; exception. Appeal bonds required of all the defendants, except Avery Kimrey.
JUDGMENTS.
The defendant John L. Anderson was sentenced to be confined in the State Prison at hard labor for an indeterminate period of not less than eight nor more than ten years. The defendant J. P. Hoggard was given a sentence at hard labor of not less than four nor more than six years. The defendant Florence Blaylock was given a sentence at hard labor of not less than four nor more than six years, under the first count charging conspiracy, and an additional year in State's Prison under the second count of the indictment, and under the fifth count he was given a sentence of five years, to run concurrently, so far as it may extend, with the sentences under the first and second counts, and under the sixth count a concurrent sentence of five years with the five years under the fifth indeterminate period of not less than four nor more than six years, and concurrent terms of five years were imposed under the fifth and sixth counts. Tom Canipe was sentenced to two years at hard labor in State's Prison, and J. F. Haraway given a like sentence. The defendant Avery Kimrey was sentenced to two years in the State's Prison, judgment to be suspended upon good behavior being shown at February and November terms of Alamance Superior Court.
The defendants appeal, assigning errors.
after stating the case: When the case was called for trial, the defendant Jerry Furlough tendered a plea of nolo contendere on the charge of conspiracy, which was accepted by the State. He was later used as a witness for the prosecution.
The judgment against the defendant, Avery Kimrey, was suspended upon terms acceptable to him and his counsel, and apparently he has not appealed. S. v. Rooks, 207 N.C. 275, 176 S.E. 752. Hence, the validity of the terms of suspension as to him, or whether they are accordant with what was said in S. v. McAfee, 189 N.C. 320, 127 N.C. 204, is not presently before us for decision. S. v. Rhodes, ante, 241. *Page 782 
The remaining six defendants by their appeal bring up for review alleged errors of the court in the trial of the cause, upon matters of law or legal inference. Const., Art. IV, sec. 8;S. v. Harrell, 203 N.C. 210,165 S.E. 551. The guilt or innocence of the several accused, sharply joined on the record, are issues of fact, determinable alone by the jury. S. v. Satterfield, 207 N.C. 118, 176 S.E. 466; S. v. Ammons,204 N.C. 753, 169 S.E. 631; S. v. Lea, 203 N.C. 13, 164 S.E. 737; S.v. Rideout, 189 N.C. 156, 126 S.E. 500; S. v. Rountree, 181 N.C. 535,106 S.E. 669; S. v. Phillips, 178 N.C. 713, 100 S.E. 577; S. v. Carlson,171 N.C. 818, 89 S.E. 30. We are not permitted to weigh the evidence here.S. v. Fain, 106 N.C. 760, 11 S.E. 593.
Was there error, or has any been shown, in any decision of the court below on any matter of law or legal inference? This — and this alone — is the inquiry presented by the appeal.
At the outset of the case, the defendants demurred to the indictment, or moved to quash, and asked for a severance. The bill charges a conspiracy on the part of all the defendants and the successive steps thereafter taken by the respective conspirators, or some of them, in the execution of their original design. These steps were six in number, all of the grade of felony, and it is permissible under our practice to join them as separate counts in a single bill. C. S., 4622; S. v. Jarrett, 189 N.C. 516,127 S.E. 590.
Speaking directly to the point in S. v. Malpass, 189 N.C. 349,127 S.E. 248, Varser, J., delivering the opinion of the Court, said: "The rule in this State now is, that different counts relating to the same transaction, or to a series of transactions, tending to one result, may be joined, although the offenses are not of the same grade," citing as authority for the position: S. v. Lewis, 185 N.C. 640, 116 S.E. 259; S.v. Burnett, 142 N.C. 577, 55 S.E. 72; S. v. Howard, 129 N.C. 584,40 S.E. 71; S. v. Harris, 106 N.C. 682, 11 S.E. 377; S. v. Mills,181 N.C. 530, 106, S.E., 677. See, also S. v. Alridge, 206 N.C. 850,175 S.E. 191.
Furthermore, bills and warrants are no longer subject to quashal "by reason of any informality or refinement," C. S., 4623, and judgments are not to be stayed or reversed for nonessential or minor defects. C. S., 4625; S. v. Whitley, ante, 661. The modern tendency is against technical objections which do not affect the merits of the case. S. v. Hardee,192 N.C. 533, 135 S.E. 345.
A similar situation to the one now presented arose in the case of S. v.Beal, 199 N.C. 278, 154 S.E. 604. There, it was held that a demurrer to the bill on the ground of duplicity was properly overruled. S. v. Knotts,168 N.C. 173, 83 S.E. 972. A like result must follow here. S. v. Lea,203 N.C. 13, 164 S.E. 737; S. v. Charles, 195 N.C. 868,142 S.E. 486. *Page 783 
Nor was there error in denying the defendants separate trials. It was the rule at common law, which still obtains with us, that, when two or more persons are indicted jointly, a motion for severance may be made on the face of the bill (S. v. Deaton, 92 N.C. 788), but the granting or refusing of the motion is a matter which rests in the sound discretion of the trial court. S. v. Donnell, 202 N.C. 782, 164 S.E. 352; S. v.Southerland, 178 N.C. 676, 100 S.E. 187; S. v. Holder, 153 N.C. 606,69 S.E. 66; S. v. Carrawan, 142 N.C. 575, 54 S.E. 1002; S. v.Barrett, 142, N.C. 565, 54 S.E. 856; S. v. Smith, 24 N.C. 402. No abuse of discretion appears on the present record. The defendants were charged with being partners in crime, conspirators, and they were tried together, as his Honor evidently thought was but meet and proper. Note, 70 A.L.R., 1171; 16 C. J., 786. The exception is not sustained.
The motions made in connection with the jury do not amount to a challenge to the array. S. v. Levy, 187 N.C. 581, 122 S.E. 386; Luptonv. Spencer, 173 N.C. 126, 91 S.E. 718. Indeed, the instruction of the court to a deputy sheriff to summon a number of men to serve as talesmen was not an order under the statute, C. S., 2321, for talesmen or a special venire. S. v. McDowell, 123 N.C. 764, 31 S.E. 839. The practice is quite common on the circuit. The jurors were subjected to all the qualifications of talesmen, and the defendants did not exhaust their challenges to the polls. S. v. Levy, supra. No just or valid complaint can be predicated upon these exceptions.
The most serious exception appearing on the record is the one addressed to the refusal of the court to strike out the alleged confession of the defendant Howard Overman. It is true, when the alleged confession was offered in evidence, its voluntariness was not questioned or determined in the manner pointed out in S. v. Whitener, 191 N.C. 659, 132 S.E. 603. The court was justified in admitting it at the time. And even when the testimony of D. P. Stewart later developed, there was no motion to withdraw the alleged confession from the consideration of the jury — at least none appears of record. The exception now insisted upon was taken at the close of all the evidence. The ruling might possibly be upheld upon procedural grounds, but inasmuch as the involuntariness of the alleged confession is apparent from the testimony of the State's witness, D. P. Stewart, we are disposed to disregard form for merit and to hold that the alleged confession should have been stricken out. S. v. Livingston,202 N.C. 809, 164, S.E., 337; S. v. Grier, 203 N.C. 586,166 S.E. 595; S. v. Davis, 125 N.C. 612, 34 S.E. 198; S. v. Drake,113 N.C. 624, 18 S.E. 166; S. v. Dildy, 72 N.C. 325; S. v. Whitfield,70 N.C. 356.
A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, but a *Page 784 
confession wrung from the mind by the flattery of hope, or by the torture of fear, comes in such questionable shape as to merit no consideration. S.v. Livingston, supra; S. v. Patrick, 48 N.C. 443.
Speaking to the subject in S. v. Roberts, 12 N.C. 259, Henderson, J., said: "Confessions are either voluntary or involuntary. They are called voluntary when made neither under the influence of hope nor fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him, and which, it is said, in the perfectly good man cannot be countervailed. These confessions are the highest evidences of truth, even in cases affecting life. But it is said, and said with truth, that confessions induced by hope or extorted by fear are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected."
Voluntary confessions are admissible in evidence against the party making them; involuntary confessions are not. A confession is voluntary in law when — and only when — it was in fact voluntarily made. S.v. Newsome, 195 N.C. 552, 143 S.E. 187.
The sustaining of this exception, however, does not affect the other defendants, because in the alleged confession no reference is made to any conspiracy, and it was admitted only as against the defendant Howard Overman.
The overruling of the motions to nonsuit under the Mason Act, and exceptions thereto, present for review the sufficiency of the evidence, taken in its most favorable light for the prosecution, to carry the case to the jury. S. v. Marion, 200 N.C. 715, 158 S.E. 406. Whether there is such evidence is a question of law for the court to determine. The credibility, weight, and effect of the testimony are for the jury. S. v.Harrell, 203 N.C. 210, 165 S.E. 551.
The practice is now so firmly established as to admit of no questioning that, on a motion to nonsuit, the evidence is to be considered in its most favorable light for the prosecution. S. v. Rountree, 181 N.C. 535,106 S.E. 669. And further, the general rule is that if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury; otherwise not, for short of this, the judge should direct a nonsuit or an acquittal in a criminal prosecution. S. v.Vinson, 63 N.C. 335. But if the evidence warrant a reasonable inference of the fact in issue, it is for the jury to say whether they are convinced beyond a reasonable doubt of such fact, the fact of guilt. S. v. McLeod,198 N.C. 649, 152 S.E. 895; S. v. Blackwelder, 182 N.C. 899,109 S.E. 644.
Tested by this rule, what are the inculpatory inferences reasonably deducible from the evidence appearing on the present record? *Page 785 
They may be listed as follows:
1. That Red Cross dynamite was thrown into the plants of Stevens Manufacturing Company and E. M. Holt Plaid Mills, Inc., of Burlington, N.C. on the night of 14 September, 1934.
2.That Florence Blaylock threw the dynamite into these plants from an automobile driven by Howard Overman.
3.That on the previous night, the dynamite magazine or storehouse of the Kirt Holt Hardware Company was broken into, by means of sawing the staple, and two or three boxes of Red Cross dynamite taken therefrom.
4.That the tracks of five persons were discovered around and about this storehouse on the following morning.
5.That the defendants J. P. Hoggard, J. F. Haraway, and Tom Canipe were in the Chevrolet automobile found in front of this storehouse about 9:30 p.m. on the night of the entry.
6.That another automobile was there, also; that Florence Blaylock had in his possession a hacksaw, which he borrowed from Jerry Furlough, and that the dynamite storehouse was opened with a hacksaw.
7.That the record discloses a plain case of store-breaking, larceny, and malicious mischief, with the question of identity as the principal issue on the last five counts in the bill.
8.That the defendant John L. Anderson hid some Red Cross dynamite on the farm of his mother-in-law, later removing it to a secluded spot near Burlington; that he talked with the defendants Florence Blaylock, Jerry Furlough, and Avery Kimrey as to how the Duke Power plant was to be blown up, and that he wanted some of this dynamite put under the house of Mr. Copeland, one of the owners of the Plaid Mills, so as to make it appear an inside job.
9.That the defendants John L. Anderson, J. P. Hoggard, Florence Blaylock, Avery Kimrey, and Jerry Furlough acted in concert in directing the actions of the defendants, both with respect to arranging for the dynamite and manufacturing evidence for their defense, for example, the understanding that Mr. King would set his watch ahead, so as to be able to establish an alibi, etc.
It appears, therefore, that the evidence was amply sufficient to carry the case to the jury on the first count as against all the defendants, except, perhaps, J. F. Haraway, Tom Canipe, and Howard Overman. As to Haraway and Canipe, however, the evidence is sufficient to convict them on the 2d 3d, and 4th counts; and Overman is to be held for another trial on the 4th, 5th, and 6th counts.
The principle upon which this conclusion rests is that, without regard to any previous design or confederation, when two or more persons aid and abet each other in the commission of a crime, all being present, all *Page 786 
are principals and equally guilty. S. v. Gosnell, ante, 401; S. v. Donnell,202 N.C. 782, 164 S.E. 352; S. v. Dail, 191 N.C. 234, 131 S.E. 574;S. v. Jarrell, 141 N.C. 722, 53 S.E. 127.
And further, it is the rule of practice in this jurisdiction that where the indictment contains several counts, and the evidence applies to one or more, but not to all, a general verdict will be presumed to have been returned on the count or counts to which the evidence relates. S. v.Snipes, 185 N.C. 743, 117 S.E. 500; Morehead v. Brown, 51 N.C. 369;S. v. Long 52 N.C. 26; S. v. Leak, 80 N.C. 404; S. v. Thompson, 95 N.C. 597;S. v. Stroud, ib., 627; S. v. Cross, 106 N.C. 650,10 S.E. 857; S. v. Toole, ib., 736, 11 S.E. 168; S. v. Gilchrist,113 N.C. 673, 18 S.E. 319; S. v. May, 132 N.C. 1020, 43 S.E. 819; S.v. Gregory, 153 N.C. 646, 69 S.E. 674; S. v. Poythress, 174 N.C. 809,93 S.E. 919; S. v. Strange, 183 N.C. 775, 111 S.E. 350.
The evidence as it relates to the charge of conspiracy tends to show that the Duke Power plant, or transformer station, was to be dynamited as well as the mills. Fortunately, this part of the plan was not carried out. The result, however, is the same so far as the motions to nonsuit are concerned. C. S., 4643.
A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. S. v. Lea,203 N.C. 13, 164 S.E. 737; S. v. Ritter, 197 N.C. 113,147 S.E. 733. Indeed, the conspiracy is the crime and not its execution. S. v. Wrenn, 198 N.C. 260, 151 S.E. 261. Compare Hyde v. U.S.,225 U.S. 347. "As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed." S. v. Knotts, supra.
There is a distinction between the offense to be committed and the conspiracy to commit the offense. S. v. Brady, 107 N.C. 822,12 S.E. 325. In the one, the corpus delicti is the act itself; in the other, it is the conspiracy to do the act. Note, 14 Ann. Cas., 156.
One who enters into a criminal conspiracy, like one who participates in a lynching, or joins a mob to accomplish some unlawful purpose, forfeits his independence and jeopardizes his liberty, for, by agreeing with another or others to do an unlawful thing, he thereby places his safety and security in the hands of every member of the conspiracy. The acts and declarations of each conspirator, done or uttered in furtherance of the common, illegal design, are admissible in evidence against all. S. v.Ritter, 197 N.C. 113, 147 S.E. 733. "Every one who enters into a common purpose or design is equally deemed in law a party to every act which had before been done by the others, and a party to every *Page 787 
act which may afterwards be done by any of the others, in furtherance of such common design." S. v. Jackson, 82 N.C. 565.
Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. S. v. Wrenn, supra. When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists. 5 R. C. L., 1088.
If four men should meet upon a desert, all coming from different points of the compass, and each carrying upon his shoulder a plank, which exactly fitted and dovetailed with the others so as to form a perfect square, it would be difficult to believe they had not previously been together. At least, it would be some evidence tending to support the inference. S. v.Whiteside, 204 N.C. 710, 169 S.E. 711.
So, in the instant case, the facts in evidence afford more than a scintilla of proof that the defendants were not acting in concord by accident. S. v. Shipman, 202 N.C. 518, 163 S.E. 657. The demurrers to the evidence were properly overruled.
The evidence upon which the defendants have been convicted comes in the main from their own alleged coconspirators and associates. If this be untrustworthy, as they now contend, it should be remembered the defendants were the first to repose confidence in these witnesses, and their appeal was to the jury. In this respect, we are unable to help them. Our jurisdiction is limited to reviewing on appeal decisions upon any matter of law or legal inference. Const., Art. IV, sec. 8.
A large number of exceptions were taken to the admission and exclusion of evidence, all of which have been examined with care. None can be sustained. Obviously, they cannot be treated separately in an opinion without extending it to "a burdensome and intolerable length." Willis v.New Bern, 191 N.C. 507, 132 S.E. 286. In several instances the record fails to disclose what the excluded testimony would have been. This renders such exceptions unavailing. S. v. Rowland, 205 N.C. 544, 172 S.E. 182;S. v. Brewer, 202 N.C. 187, 162 S.E. 363; 81 A.L.R., 1424; S. v.McNair, 93 N.C. 628. *Page 788 
Likewise, many of the exceptions to the charge are gossamery and attenuate in character. It would be supererogatory to consider themseriatim, in an opinion. Nevertheless, they have been thoroughly considered. None has been overlooked.
Stress has been laid upon the following instruction given at the jury's request:
"You may convict one or more and acquit the others, on any count. You may convict them all, or you may acquit them all, on any of the counts."
The principal criticism of this instruction is that it permits a conviction of only one of the defendants on the charge of conspiracy. The defendants have apparently overlooked the fact that Jerry Furlough was named in the indictment as one of the alleged conspirators, "and others by name to the jurors unknown." This would render inapplicable the principle announced in S. v. Mickey, 207 N.C. 608, 178 S.E. 220; S. v. Diggs,181 N.C. 550, 106 S.E. 834; and S. v. Tom, 13 N.C. 569. Furthermore, the point is academic, as the jury returned a general verdict against all the defendants on trial. It is also observed that during the charge, the court stated: "I shall hand you, gentlemen, before I conclude, a list containing the several counts in the bill of indictment and the names of the defendants who are included in the several counts. This will be to guide you and help you and to assist you — not in any way to control you in any manner, but simply to help you to arrive at your verdict."
It is not perceived in what way the instruction, assigned as error, was hurtful to the defendants.
Nor was there error in the court's instruction to the jury that the testimony of the defendants and their near relatives who went upon the stand and testified in their behalf should be scrutinized with care in order to ascertain to what extent, if any, their testimony was warped or biased by their interest, adding, however, that if, after such scrutiny, they believed such witnesses, they would give the same credit to their testimony as if they were disinterested. S. v. Lee, 121 N.C. 544,28 S.E. 552; S. v. Deal, 207 N.C. 448, 177 S.E. 332.
Again, the defendants complain because the trial court did not caution the jury, or instruct them, as to how the testimony of detectives and accomplices should be received and considered. S. v. Palmer, 178 N.C. 822,101 S.E. 506. There was no request for such instruction, and the assignment is without exceptive basis. A similar contention was advanced and rejected in S. v. O'Neal, 187 N.C. 22, 120 S.E. 817. A like result must follow here.
A remark made by the court during the trial, rhetorically appreciative of the jury, was also the subject of comment on the argument, but as no *Page 789 
objection or exception was taken at the time, the matter is not properly before us for review. No doubt the remark would have been corrected or withdrawn, if seasonably called to the court's attention. The rule on appeal is, that questions are to be presented by exceptive assignments of error. Rule 19 (3), Rules of Practice; S. v. Freeze, 170 N.C. 710,86 S.E. 1000; Rawls v. Lupton, 193 N.C. 428, 137 S.E. 175.
Finally, the defendants stressfully contended they were discredited in their defense by the following instruction:
"Now, you are not concerned, gentlemen, with the opinions of the attorneys. It doesn't make any difference to you what the attorneys in the case think about it — whether they think the defendants innocent or guilty. You are only concerned with the evidence in the case — which you will not take from the attorneys nor from the court. It is your duty to remember the evidence and to be governed exclusively by the evidence."
The basis of the objection to this charge is, that it lessened the force of the argument of counsel made in behalf of the defendants in the exercise of their constitutional and statutory rights. S. v. Hardy, 189 N.C. 799,128 S.E. 152. If this were so, there would be substance to the objection. It is observed, however, that it was not the argument of counsel, but their opinions as to the guilt or innocence of the accused, which the jury was told to disregard. In this there was no error. Characterization is not argument. Nor is it regarded as proper for counsel to express their opinions upon the question which the jury is impaneled to decide. Stanleyv. Lbr. Co., 184 N.C. 302, 114 S.E. 385. For example, in concluding the argument of the instant case on appeal, counsel for some of the defendants, Mr. Levinson, said that in his opinion the defendants had not had a fair trial, and that the charges against them should be dismissed. This was venturing an opinion beyond the province of counsel. Evidently a similar impropriety occurred in the court below, and it was this which the jury was instructed not to consider.
Again recurring to the case of Avery Kimrey, it appears that he did not join in the motion to set aside the verdict; and no bond was required of him. He and his counsel consented to the terms upon which the judgment as to him was suspended. Yet in the entries of appeal it appears "the defendants, and each of them, except and appeal to the Supreme Court." If this were intended to include the defendant Kimrey, the appeal as to him must be dismissed, as he sought and accepted the indulgence and forbearance of the court. S. v. Henderson, 207 N.C. 258, 176 S.E. 758; S. v.Burnette, 173 N.C. 734, 91 S.E. 364; S. v. Tripp, 168 N.C. 150,83 S.E. 630; S. v. Griffis, 117 N.C. 709, 23 S.E. 164; S. v. Johnson,169 N.C. 311, 84 S.E. 767; S. v. *Page 790 Edwards, 192 N.C. 321, 135 S.E. 37. In this respect, his case is just the reverse of what occurred in S. v. Burgess, 192 N.C. 668,135 S.E. 771.
We were told on the argument that as a matter of economic justice the charges against the defendants should be dismissed. It is observed, however, that the prosecution involves no rights arising out of the relationship of employer and employee. Indeed, whether such relationship exists is not pertinent to the inquiry. The record reveals a plain case of violence and wilful injury to property as a result of an unlawful conspiracy. No one, we take it, is willing to condone this conduct. The law condemns it, and it is to the interest of all that the offenders be apprehended. The cause of justice is never served by beclouding the issue. A jury of the vicinage has found, upon competent evidence, that the present defendants are the guilty parties. With the exception of Howard Overman, they have no legal grounds to complain.
The result, therefore, is as follows:
On appeal of defendants Anderson, Hoggard, Canipe, Haraway, and Blaylock, no error.
On appeal of defendant Overman, new trial.
On appeal of defendant Kimrey, appeal dismissed.
DEVIN, J., took no part in the consideration or decision of this case.