DEVIN, J., dissenting.
SCHENCK and SEAWELL, JJ., concur in dissenting opinion.
Criminal prosecution tried upon indictment charging the defendants with the murder of one E. J. Swanson.
There is evidence tending to show that on the night of 19 February, 1943, between 8:30 and 9:00 p.m. the three defendants (two brothers, one 20 years of age, the other younger, and the third 19 years old) appeared in an automobile near E. J. Swanson's store and filling station at Jamestown, N.C. They tried to stage a hold-up and robbery. Elmer Hardie Biggs, Jr., remained at the wheel while the other two defendants entered the store. In executing the plan, John Edgar Messer shot Swanson and killed him. The two defendants then "broke and ran out the door." They re-entered the automobile, which was waiting on the outside, and all three of the defendants made a get-away. They were next discovered, 19 March, in jail in Danville, Va., there charged with having committed highway robbery in that State on 16 March, 1943.
On several occasions between 19 and 31 March, various officers of Guilford County and Messrs. H. W. Zimmerman and Guy L. Scott of the State Bureau of Investigation went to Danville and questioned the defendants in regard to the Swanson murder. They stated on each occasion that they had no statement to make; that they desired to talk with an attorney, and they denied any connection with the crime until 31 March, when about a dozen witnesses and officers from this State, including the Solicitor of the 12th Judicial District, were in Danville, and the defendants, on this last day, after conferring among themselves, told the officers that they had planned to rob the Swanson store on the night of 19 February, and in doing so Mr. Swanson was shot.
No charges had been preferred against the defendants in this State at the time, and their statements were not reduced to writing.
The defendants testified on the voir dire that they were induced to make their statements in the nature of confessions because "Mr. Zimmerman and Mr. Wilson, the solicitor, came back, and he told us he was *Page 25 
going to put this bill of indictment for second degree murder which carried a penalty of twenty-five to thirty years in our home State and at most, in all probability, we would be out in five years. . . . Mr. Wilson and Mr. Zimmerman both made that statement."
The officers denied that any such inducements or offers were made to the defendants, and the solicitor testified that he went to Danville to make sure that no unfair method was employed by anyone in undertaking to identify the perpetrators of the Swanson murder.
Aside from the contradictory evidence, heard on the preliminary inquiry, of which there was quite a bit, the following undisputed testimony is culled from the record and the State's witnesses:
Deputy Sheriff Ray Nance: "By the Court: Was your purpose in going there together with the solicitor and all of you to obtain a confession from these men?
"The witness: I wouldn't say that was our direct purpose there. . . . We were asking them to make a statement. . . . They asked to be permitted to talk together, and they were permitted to talk together, and after that they made a statement."
A special agent for the State Bureau of Investigation, H. W. Zimmerman, testified that he told the defendants "they had been arrested on a charge in the State of Virginia for which the penalty was life imprisonment or the electric chair. . . . A part of my scheme was to tell them that under the law in Virginia they were liable to pay the death penalty. I told them it was a capital offense in Virginia. . . . I told Elmer Hardie Biggs that I didn't like the word confession; that we were not trying to get a confession out of them. I wanted the truth. . . . You can call it a confession. I call it the truth. . . . When I went in the room where all three of the defendants were, Elmer Biggs asked the question something about first degree and second degree charge in North Carolina. If I remember correctly, I think I said, `If you three boys are charged with the murder of Mr. Swanson, . . . the solicitor will draw a bill for murder in the first degree. . . . As to what will be done with you will be left to the jury and the court. . . . After that, the request was made that the two Biggs boys be permitted to talk to Messer alone. The request was granted, and they went into the room where Messer was and were there three to five minutes. Elmer Hardie Biggs came out and called for Ray Nance. Mr. Nance and myself, Mr. Jones, Ballinger, Donovant and Mr. Watts went into the room where these three boys were, and John Messer made a statement in the presence of the two Biggs boys.' . . .
"By the Court: Can you give me any satisfactory answer why these three young men or two young men, or any one of them, would sit there, after having stated time and time again that they had no statement to *Page 26 
make, and would all of a sudden turn around and say, `I want to make a statement that will hang me'? A. Your Honor, I cannot. Q. I cannot understand that."
Elmer Hardie Biggs, Jr., one of the defendants, testified on the voirdire: "Mr. Zimmerman said, `What I can't understand is why,' he was hitting the desk all the time, he said, `I can't understand why an intelligent young man like you, why you can't see the difference in twenty-five to thirty years in your home State and life imprisonment at the best in another State than your own.'" The witness Zimmerman, though present, was not recalled on the preliminary inquiry to deny or to refute this statement.
Upon all the evidence heard in the absence of the jury the trial court held the statements to be voluntary and admitted them in evidence. Exception.
Verdict: Guilty of murder in the first degree as to each defendant.
Judgments: Death by asphyxiation as to each defendant.
The defendants appeal, assigning errors.
The question for decision is whether the statements in the nature of confessions made by the defendants were properly admitted in evidence. S.v. Exum, 213 N.C. 16, 195 S.E. 7. The answer depends on whether the law pronounces them voluntary or involuntary. S. v. Farrell, 223 N.C. 804.
It is conceded that if the evidence in respect of the voluntariness of the statements were merely in conflict, the court's determination would be conclusive on appeal. S. v. Hairston, 222 N.C. 455, 23 S.E.2d 885;S. v. Smith, 221 N.C. 400, 20 S.E.2d 360; S. v. Whitener, 191 N.C. 659,132 S.E. 603; S. v. Christy, 170 N.C. 772, 87 S.E. 499; S. v.Page, 127 N.C. 512, 37 S.E. 66; S. v. Burgwyn, 87 N.C. 572. Equally well established, however, is the rule that "what facts amount to such threats or promises as make confessions not voluntary and admissible in evidence is a question of law, and the decision of the judge in the court below can be reviewed by this Court." S. v. Andrew, 61 N.C. 205; S. v.Manning, 221 N.C. 70, 18 S.E.2d 821; S. v. Crowson, 98 N.C. 595,4 S.E. 143. And further, where a "person in authority" offers some suggestion of hope or fear, S. v. Livingston, 202 N.C. 809,164 S.E. 337; S. v. Grier, 203 N.C. 586, 166 S.E. 595, *Page 27 
to one suspected of crime and thereby induces a statement in the nature of a confession, the decisions are at one in adjudging such statement to be involuntary in law, and hence incompetent as evidence. S. v. Anderson, 208 N.C. 771, 182 S.E. 643; Annotation 7 A.L.R., 423.
What are the effective considerations here?
The defendants were in jail at Danville, Virginia, under a charge of highway robbery committed in that State on 16 March, 1943. Officers from this State went to Danville to interrogate them in respect of the Swanson murder at Jamestown, North Carolina, on the night of 19 February, 1943. They were questioned on a number of occasions, including at the end the greater part of two days, 30 and 31 March, and they repeatedly told the officers they had no statement to make in respect of the Swanson case. Finally, they made the statements in the nature of confessions as above set out. Over objections, these statements were admitted in evidence against them.
A free and voluntary statement in the nature of a confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, but any statement wrung from the mind by the flattery of hope, or by the torture of fear, comes in such questionable shape as to merit no consideration. S. v. Patrick, 48 N.C. 443; S. v.Roberts, 12 N.C. 259. "Confessions are to be taken as prima facie
voluntary, and admissible in evidence, unless the party against whom they are offered allege and show facts authorizing a legal inference to the contrary" — Dillard, J., in S. v. Sanders, 84 N.C. 729; S. v.Alston, 215 N.C. 713, 3 S.E.2d 11; S. v. Grass, 223 N.C. 31,25 S.E.2d 193.
As bearing upon the influence which produced the defendants' statements in the nature of confessions, whether prompted by the love of truth or induced by hope or fear, the record poses the following pertinent inquiries: Why was it a part of Zimmerman's "scheme" to tell the defendants "they were liable to pay the death penalty" in Virginia? Why did he tell them that in North Carolina "as to what will be done with you will be left to the jury and the court"? What impression did he intend to leave by these statements? Just before the admissions were made, Elmer Biggs wanted to know "something about first degree and second degree charge in North Carolina." He had already been informed "that under the law in Virginia they were liable to pay the death penalty." Where did Elmer Biggs, a boy 20 years of age, get his knowledge of criminal procedure in this State and the idea that under the North Carolina law, second degree murder carries a maximum penalty of 30 years, and, in addition, the parole system obtains here? What was the purpose of discussing these considerations in connection with the Virginia statute (Va. Code 1942, sec. 4405), which prescribes death or *Page 28 
life imprisonment as punishment for robbery with firearms? What bearing could they have had on the Swanson murder, except to induce an expression on the subject different from the repeated protestations of the defendants that they had no statement to make in respect of the matter?
We think the statements in the nature of confessions made by the defendants must be regarded as arising out of circumstances which render them involuntary, and, therefore, incompetent as evidence. The decision inS. v. Livingston, supra, and the cases there cited, would seem to be in direct support of the position. To say that no inducement was offered by "those in authority" would be to deny the natural import of the language used and the suggestions made, and withal the situation created by the presence of the solicitor. The effort of the trial court to obtain some satisfactory explanation of the sudden change on the part of the defendants appears to have been fully justified. The case is equally as strong, if not stronger, than S. v. Anderson, supra, where a new trial was granted because of similar suggestions made by a State's witness.
It is true, there is ample evidence to convict the defendants without their statements in the nature of confessions. But this in no way affects the competency or materiality of the statements. They undoubtedly weighed heavily against the defendants. The law commands the death penalty only after a hearing free from error.
On the record as presented, a new trial seems necessary. It is so ordered.
New trial.