STATE v. CLEM WRENN, W. H. FOSTER AND C. C. FAW.

(Filed 22 January, 1930.)

**1. Conspiracy A a—Elements of conspiracy.**

In order to constitute a conspiracy it is required that two or more persons agree together and form the intent to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means, and neither the consummation of the intent nor any overt act in furtherance of the conspiracy is necessary, and while the criminal character of a combination or agreement may be inferred from facts and circumstances, such facts and circumstances must point unerringly to that end.

**2. Same—In this case held: evidence of defendant's guilt of entering into a conspiracy was insufficient.**

Where, in a prosecution for criminal conspiracy the evidence is that one of the defendants was the president of a bank negotiating notes for the county board of education and the county board of road commissioners, and that he was also president of a certain construction company, and that the second defendant was a stockholder in the construction company, and was also county superintendent of roads, and that the third defendant was the chairman of the board of education, and that the first defendant, regarded as a man of high character, procured from the other defendants notes of the board of education and of the board of road commissioners to be used to renew outstanding notes of these bodies and raised them and used the funds in his bank and for the construction company without the knowledge or consent of the codefendants who received no benefit: *Held*, the evidence is insufficient to convict the latter named codefendants of criminal conspiracy, and their motions as of nonsuit should have been allowed. C. S., 4643.

APPEAL by defendants, W. H. Foster and C. C. Faw, from *Barnhill, J.,* at Special Criminal Term, September, 1928, of WILKES.

Criminal prosecution tried upon an indictment charging Clem Wrenn, W. H. Foster and C. C. Faw with conspiracy, in that it is alleged they unlawfully and feloniously agreed, conspired and confederated among themselves to cheat and defraud Wilkes County, the Bank of Wilkes, and certain New York banks out of large sums of money, "contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

In support of the indictment, the evidence offered by the State tends to show that, during the years 1925, 1926 and 1927, Clem Wrenn was president of the Bank of Wilkes and also president of the Foster Construction Company, a corporation engaged in road construction work, with a bank account in the Bank of Wilkes; that W. H. Foster was interested in the Foster Construction Company, as stockholder, and was its nominal secretary and treasurer; he was also superintendent of roads of Wilkes County; that C. C. Faw was chairman of the board of educa-

tion of Wilkes County, and that a part of the funds obtained on spurious notes of the board of education were placed to the credit of the Foster Construction Company in the Bank of Wilkes and used by said company.

The principal transactions were as follows:

1. During 1926 and 1927 the board of education of Wilkes County had two valid notes outstanding, one in the sum of $10,000 and the other in the sum of $25,000, both of which had been negotiated through the Bank of Wilkes and were held by banks or bankers in the city of New York. Shortly before their maturity Wrenn, president of the Bank of Wilkes, told Faw, chairman of the board of education, that renewal notes ought to be sent to New York in time to meet said maturing notes. Faw, thereupon, called the secretary of the board, C. C. Wright, over the telephone and obtained authority to sign his name to both renewal notes. Wrenn later suggested that if the renewal notes were made out in smaller denominations perhaps a better rate of interest might be obtained. Whereupon, seven notes of $5,000 each were executed by Faw (Wright's name being signed by Faw on the authority previously given over the telephone) and delivered to Wrenn, who was to complete their execution by obtaining the signature of the county attorney and have him affix the seal of the board of education. Wrenn took the notes to the office of the county attorney and, finding him out, affixed the seal to the notes himself, had another attorney certify to their legality, and then raised said notes from $5,000 to $25,000 each. From time to time Wrenn negotiated one or more of these notes in New York, dating them apparently to suit his convenience or necessity, and placed $41,000 of the proceeds to the credit of the Foster Construction Company, and the balance over the amount for which the board of education was legally liable seems to have been used by Wrenn for his own purposes or for the Bank of Wilkes.

2. In February, 1927, the board of commissioners of Wilkes County had a $6,000 note falling due in New York, which said note was duly issued for road work in the county. To take up this note the board of commissioners executed a renewal note, in a like sum, and turned it over to Wrenn, president of the Bank of Wilkes, to be used by him in caring for the road note soon to mature. Wrenn informed Foster, superintendent of roads, that in some way this renewal note had become blurred or splotched, and that the New York bankers would not accept it. Whereupon, as the matter was urgent, he insisted that Foster see the chairman of the board of commissioners and have another note executed to take the place of the blurred or splotched one. This was done, the chairman executing a blank note, which Wrenn filled out for $25,000 instead of $6,000, and had the county seal placed on it. A few

days thereafter the chairman of the board of commissioners spoke to Wrenn about the matter, and was informed by him that the New York bankers had subsequently reconsidered their objection to the alleged blurred or splotched note, accepted it, and that he, Wrenn, had destroyed the note executed to take its place, which representation seems to have been false, as Wrenn wrongfully negotiated said note for other purposes.

It is not contended that Faw had anything to do with any of the road notes.

Wrenn testified that he alone was responsible for altering and raising the notes in question, and that neither Faw nor Foster had anything to do with any of the illegal transactions appearing of record. Faw and Foster also testified that they knew nothing of Wrenn's unlawful schemes. Wrenn is now, and was at the time of trial, serving a term in the State's prison for fraudulently issuing these six notes of $25,000 each and embezzling the proceeds, to which he pleaded guilty. He does not appeal, as prayer for judgment in the present case was continued as to him.

Prior to the failure of the Bank of Wilkes in May, 1927, Wrenn was regarded by his friends and associates as a man of integrity and honor; he had the entire respect and goodwill of the community; no one suspected his wrongdoing, and Faw and Foster both placed confidence in his word, as did the local business people.

From an adverse verdict and judgment against W. H. Foster and C. C. Faw that each be confined in the State's prison for a term of not less than four nor more than seven years, the said defendants appeal, assigning errors.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Charles G. Gilreath, J. H. Burke and Manning & Manning for defendants Faw and Foster.*

STACY, C. J., after stating the case: It is not seriously contended that all three of the defendants participated in any one of the transactions appearing of record. The dealings in connection with the school notes relate only to Wrenn and Faw, while those touching the road notes involve only Wrenn and Foster. And we have discovered no evidence of sufficient probative value to establish a conspiracy between any two of the defendants.

The gist of a conspiracy has been described as an unlawful concurrence of two or more persons in a wicked scheme—a combination to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful

means—and it is said that no overt act on the part of any of the conspirators is necessary to complete the crime, but the intent to accomplish some crime or unlawful purpose, or to bring about some end, not in itself criminal or unlawful, by criminal or unlawful means, is a necessary element of the offense. *S. v. Ritter,* 197 N. C., 113, 147 S. E., 733; *S. v. Martin,* 191 N. C., 404, 132 S. E., 16; *S. v. Dalton,* 168 N. C., 204, 83 S. E., 693; *S. v. Van Pelt,* 136 N. C., 633, 49 S. E., 177; *S. v. Trammell,* 24 N. C., 379; 5 R. C. L., 1060. "If two or more persons conspire to do a wrong, this conspiracy is an act 'rendering the transaction a crime,' without any step taken in pursuance of the conspiracy." *S. v. Brady,* 107 N. C., 822, 12 S. E., 325. The *conspiracy* is the crime, and not its execution. *S. v. Younger,* 12 N. C., 357; 5 R. C. L., 1066. It requires the confederation of at least two, as one person cannot conspire alone, and of course it may include more. *S. v. Diggs,* 181 N. C., 550, 106 S. E., 834; *S. v. Christianbury,* 44 N. C., 46; 5 R. C. L., 1078.

It is true, of course, that the criminal character of a combination, agreement or confederacy may be inferred from facts and circumstances, where they point unerringly to that end, but here the situation of the parties seems to repel any idea of a conspiracy, certainly as between Wrenn and Faw, and while there may be more reason for inferring a combination between Wrenn and Foster, we have concluded that the evidence is not sufficient to establish this either. Faw had profited nothing by the machinations of Wrenn, nor does it appear that Foster did so knowingly, or that he was "consenting unto the wrong." So far as the record discloses, both Faw and Foster seem to have been no more than victims of misplaced confidence. This is not enough to hold them for a conspiracy.

It follows, therefore, that the motion of the appealing defendants for judgment as in case of nonsuit should have been allowed. The motion will be sustained here as provided by C. S., 4643.

Reversed.