STATE v. WARREN WALKER, CALVIN RAY PEGRAM, ROBERT ED-
WARD ABBOTT, MALCOLM JARRELL, JOHNNIE MARTIN, BOYD
E. PAYTON, LAWRENCE GORE AND CHARLES AUSLANDER.

(Filed 14 January, 1960)

**1. Conspiracy § 6—**

In a prosecution for conspiracy, evidence tending to prove the guilt
of any two of the defendants as a fairly logical and legitimate de-
duction, and which raises more than a mere suspicion or conjecture
of their guilt, precludes nonsuit as to such defendants.

**2. Conspiracy § 3—**

A conspiracy is an agreement between two or more persons to do an
unlawful thing or to do a lawful thing in an unlawful way or by un-
lawful means, and since the agreement itself is the offense it is not
necessary that the object of the agreement should be accomplished.

**3. Conspiracy § 6— Evidence of guilt of conspiracy held sufficient to
overrule nonsuit.**

Evidence tending to show that strikes had been called by the local
unions at two specified mills, that a staff representative of the national
union originated and discussed with the State's witness a plan to bomb
the boiler room of one of the mills in order to stop operations at the
mill, which plan was later enlarged to cover the bombing of two other
sites, that thereafter personal meetings were had by certain of de-
fendants in formulating the plan, that three of defendants were ar-
rested at the place agreed upon as the rendezvous prior to going to con-
summate the conspiracy, together with admissions made by two of
them after a tape recording of one of the meetings had been played
to them, with other incriminating facts and circumstances, *is held*
sufficient to overrule nonsuit as to each of such defendants in a prose-
cution for conspiracy.

**4. Same— Evidence that one of defendants had knowledge of conspiracy
and agreed to deliver message to another in furtherance of com-
mon design held sufficient as to his guilt.**

Where a conspiracy among certain of defendants to bomb certain
properties to stop operations at a mill during a strike is established,
the State's evidence that the State's witness phoned one of the con-
spirators at his hotel for explanation why certain other of the con-
spirators had failed to meet him as agreed, that the person who an-
swered the phone was not the conspirator called, but that such person
identified himself, that such person was a union official, the superior
of one of the conspirators, whose voice was recognized by the State's
witness, that such person's conversation indicated he knew of the con-
spiracy and the necessity of avoiding any connection of the union there-
with, but promised to get in touch with the conspirator who had been
called, *is held* sufficient, together with other incriminating circumstances,
to be submitted to the jury as to such person's guilt as a co-conspirator.

**5. Criminal Law § 67—**

Evidence that a telephone conversation was made to the room of one

person, that the superior of such person answered the phone and identified himself, together with the testimony of the person making the call that he recognized the voice as that of the person who had identified himself, is sufficient to take the question of the identity of the antiphonal speaker to the jury.

**6. Conspiracy §§ 3,6: Criminal Law § 7—**

The mere fact that an agent of the law pretended to be acting in conjunction with several others in a criminal conspiracy does not absolve such others from criminal responsibility, since even though the agent of the law did not join in the conspiracy, the illegal agreement between any two others would constitute the offense.

**7. Criminal Law § 15—**

A prosecution for conspiracy is properly brought in the county in which the conspiracy was to be consummated and where several of the conspirators had come to consummate it and had been arrested.

**8. Indictment and Warrant § 4—**

Defendants are not entitled to examine members of the grand jury to support their contention that the finding of a true bill was based solely on incompetent evidence or that one of the two bills was not based on any evidence given in connection therewith.

**9. Criminal Law § 164—**

Where the sentences on each of three indictments are concurrent and identical as to each defendant, error would have to relate to all three indictments in order to be prejudicial.

**10. Indictment and Warrant § 14—**

Motion to quash after the introduction of the evidence is not made in apt time.

**11. Criminal Law §§ 39, 84—**

Where the motives and credibility of a State's witness have been attacked on cross-examination it is competent for such witness upon redirect examination to explain his motives for the purpose of repelling the attack on his credibility.

**12. Criminal Law § 97—**

Where it appears that persons other than defendants were present at the time referred to in the testimony of the State's witness and could have contradicted the State's witness if the facts related by him were untrue, the prosecution may argue to the jury that no one had testified in contradiction of the State's witness, and such argument will not be held improper as a comment upon defendant's failure to testify.

**13. Constitutional Law § 30—**

Every person charged with a crime is entitled to a fair and impartial trial.

**14. Conspiracy § 5: Criminal Law § 34—**

In a prosecution for conspiracy to bomb a mill and transformers pro-

viding power for the operation of the mill in order to stop operations at the mill during a strike, testimony of statements made by defendants in regard to their knowledge as to which transformer would have to be destroyed to interrupt power to the mill is competent to show their asserted skill and ability to accomplish the purpose of the conspiracy, and the fact that such testimony may tend to implicate the defendants in other offenses is not ground for its exclusion.

15. **Criminal Law § 162—**

Where competent evidence has been excluded there can be no prejudicial error arising from the fact that it was heard by the jury before the court instructed them not to consider it, or that after the jury had returned into the courtroom the transcript of such evidence was again read them upon the request of the solicitor.

16. **Criminal Law § 67½ —**

Incriminating conversations between defendants recorded by a tape recorder placed in a room with the consent of the person renting and occupying the room are competent.

17. **Criminal Law § 96— Action of solicitor held not to amount to the taking of unfair advantage of defendants.**

Where a tape recording is material to the case as inducing confessions by certain of defendants, the act of the solicitor in offering the recordings in evidence with the statement to the effect that some of the matters therein contained might not be competent but that they were offered for corroboration of witnesses and for use by the defendants if they so desired, will not be held prejudicial on the ground that the solicitor thereby undertook to take unfair advantage of defendants when prior occurrences had indicated defendants did desire to attack the validity of the recordings and there is nothing in the record to impugn the motives of the solicitor.

HIGGINS, J., took no part in the consideration or decision of this case.

BOBBITT, J., dissenting in part.

APPEAL by defendants from *Mallard, J.,* July 13, 1959 Special Criminal Term, of VANCE.

Defendants were charged, in three bills of indictment, with a conspiracy to injure by dynamite or other high explosives properties in Vance County. The conspiracy charged in bill 3508 was to dynamite the boiler room including the boiler and other machinery of Henderson Cotton Mills. In bill 3509 the conspiracy alleged was to dynamite the main office building of Harriet Cotton Mills, and in bill 3510 the conspiracy charged was to dynamite the substation, transformer, switches, and power lines of Carolina Power and Light Company. The cases were consolidated for trial. Verdicts of guilty were returned as to each defendant on each charge. Prison sentences were imposed, identical as to each defendant, on each charge

but varying as to the different defendants. The three sentences imposed on each defendant run concurrently. Defendants excepted to the judgments rendered and appealed.

*Attorney General Seawell and Assistant Attorney General McGalliard for the State.*

*W. M. Nicholson, James J. Randleman, James B. Ledford, and Hill Yarborough for defendants, appellants.*

RODMAN, J., The record contains 225 assignments of error. Manifestly a seriatim discussion is not desirable. Instead we treat the basic principles which appellants urge in support of their assignments of error.

When the State rested, defendants severally moved for nonsuit which, if allowed, would have the force and effect of a judgment of not guilty. G.S. 15-173. They offered no evidence. The court overruled the motions and defendants severally excepted. The correctness of the rulings on the motions so made is the first question presented.

If the evidence offered, when viewed in the light most favorable to the State, was sufficient for a jury to fairly conclude that any two defendants were guilty, the motion as to those defendants was properly overruled. *S. v. Horner,* 248 N.C. 342, 103 S.E. 2d 694; *S. v. Block,* 245 N.C. 661, 97 S.E. 2d 243; *S. v. Simpson,* 244 N.C. 325, 93 S.E. 2d 425. If, however, the evidence amounts to no more than suspicion or conjecture, the motion to nonsuit should have been allowed. *S. v. Glenn,* 251 N.C. 156.

The bills charge that defendants "did unlawfully, willfully and feloniously combine, conspire, confederate and plan together to willfully, maliciously and wantonly injure" the property of another. A conspiracy is an agreement by two or more persons to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. The heart of the conspiracy is the agreement. It is not necessary that the object sought by the agreement be accomplished. *S. v. Hedrick,* 236 N.C. 727, 72 S.E. 2d 904; *S. v. Parker,* 234 N.C. 236, 66 S.E. 2d 907; *S. v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686; *S. v. Andrews,* 216 N.C. 574, 6 S.E. 2d 35; *S. v. Lippard,* 223 N.C. 167, 25 S.E. 2d 594; *S. v. Anderson,* 208 N.C. 771, 182 S.E. 643; *S. v. Whiteside,* 204 N.C. 710, 169 S.E. 711.

The refusal to nonsuit requires an examination of the evidence to ascertain if there was an agreement between defendants or any two of them to maliciously injure the property of Harriet Cotton Mills or Carolina Power & Light Company. The evidence as to

the guilt of defendants Martin, Payton, Gore and Auslander is confined to the testimony of witness Aaron. Evidence of guilt of defendants Walker, Abbott, Pegram, and Jarrell appears in the testimony of the witness Aaron and confessions related by agents of the S. B. I.

The development of the conspiracy, as related by Aaron, can best be treated chronologically. Aaron is a resident of Leaksville, N. C. He knows Auslander, who lives in a hotel in Reidsville but works in Spray. He testified: "During the month of May, 1959, I saw Auslander five or six times. He has an office in the Textile Workers Union of America Union Hall in Spray. I think he is the manager of the Local and has been, best I recall, eight, nine, ten years. . . I had an occasion to see him during the month of May, on or before about the 21st of May, in his office at the Union Hall, pursuant to some word I got from somebody. I went to the Union Hall and talked to him during the day. . . We discussed the strike situation in Henderson, and he said that the Henderson strike was affecting all of the unions in the South and said if the strike was not won in Henderson, it would be against all of the unions in the South.

"We discussed the possibility of going to Henderson to put the mill out of operation. Auslander first mentioned it. He wanted to know if I would go to Henderson and bomb the boiler room and stop operation of the mill. . . .I told him I would do it, would bomb the boiler room, nobody else was present except me and him. We discussed the substation that supplied the mill with power and I told him that I knew where it was. . . .He asked me if I could get somebody to help me. I told him I thought I could.

"I left with the understanding I would get somebody else and meet him. . . .I brought E. C. McBryde from Draper with me to talk with him about the bombing. That conversation was in his office in the daytime. (Present at that time were Auslander, Dave Harris, Auslander's assistant, McBryde, and Aaron). . . .Then we talked of going through with the bombing of the boiler room and the substation that feeds the cotton mills in Henderson. That just about taken care of the conversation at that time. . . .

"I saw Auslander again at his office that afternoon and had a conversation with him. . . .

"Auslander told me to go to Henderson and look the situation over. He gave me $10.00 for expenses to go down to Henderson and look the boiler room over and the substation. That was in cash."

The witness contacted a member of the State Highway Patrol and informed the patrolman of his conversation with Auslander. The patrolman put Aaron in touch with a member of State Bureau of In-

vestigation. He related his conversation with Auslander. Pursuant to an understanding with members of the S. B. I. that he would keep them informed of what transpired, he went to Henderson. He testified: "I came to Henderson on the 2nd of June. . . .When I arrived in Henderson, I called Johnnie Martin from a service station . . . .I saw him at his home. . . .It was daytime when I saw him. . . . When I reached Martin's home, I knocked on the door and he came to the door and I told him that Auslander had sent me down there . . . .I said that I was sent to contact him and we went and got in his car and we discussed why I came to see him. . . .I told him I was sent to bomb the boiler room and the power station and that he would help me out and I told him of another name. . . .I showed him the paper I had. . . .Mr. Auslander gave me the paper in his office at the last meeting with him. . . .He said that he talked to these boys in Henderson and said that he did not think that Martin would actually do the bombing, but said that he would help me out in any other way that he could. . . .When I was talking with Martin on this occasion he asked me first why I had not come when I was supposed to. He asked me why I did not come when I was supposed to the week previous. . . .Martin said that he would be the one to go between me and Walker if we had to get in touch with each other. Then I went to Warren Walker's home and saw Walker. . . . We talked of the bombing of the boiler room, how to get into it. . . . I told Walker I was down there to bomb the boiler room and asked him would he help me. He said he would. I told him the boy I was going to bring with me could not come and I had to have somebody to help me, and I told him that I understood that they knew all about it and he said they did. . . .I told him that it had to be so that the Union would not be involved in it. If we got caught, we were on our own and they would not have anything to do with it. . . .

"After talking with Walker at length about the actual bombing and how we would do it, I sat up a meeting to meet him. I told Walker we would bomb the boiler room and the substation. . . .He said that he was going to help me bomb the boiler room, the power station, and we talked of all of the things. . .Walker did not at that time mention the office of the Harriet Cotton Mills. . . .I next talked to him at the Brookwood Motel on or about the 3rd of June. . . . Lawrence Gore was with him. It was in the nighttime. . .Gore asked me why I didn't come when I was supposed to and I explained to him why I didn't come, that I didn't trust the boy I was bringing with me and I could not bring him and I told him that I would rather come by myself. . . .

"Gore said that he thought that the main office building of the

South Henderson Mill would be of more importance than the boiler room. He said that they had records that could not be replaced. . . He said he would see some boys that were to help me do the actual bombing and he said that me and him would not meet again. . . ."

Aaron returned to Rockingham County on 5 June. He testified: "I saw Auslander when I got to Leaksville. He asked me why I had not got rid of the main office building. We were discussing dynamite and he had made a call—he told me that he was going to call South Carolina. . . .He said: 'I am going to make a call.' He said about some 'bones,' as to what kind of 'bones,' that is dynamite. He made the call on the telephone. I heard what he said when he made the call. He placed the call to Spartanburg, South Carolina. . .I heard what he said to him. He said that he needed, asked him first did he have any 'bones' hid. . . .In response to what the person on the other end of the line said, Auslander said, he had a boy in the office there that would come down and get them, get the bones."

Aaron communicated this conversation to the S. B. I. Pursuant to their request, he came to their office in Raleigh. He then went to the Brookwood Motel at Roanoke Rapids. This room had, with Aaron's consent, been wired with a tape recorder. Aaron continued: "Warren Walker came to my room alone. I talked with him. . . . he asked me what I was planning to do and I told him that I didn't know, that as far as I was concerned that the 'bones' would have to come from Henderson, because I could not get any in Leaksville. . . we talked about bombing the boiler room, the substation and the setting fire with Molotov Cocktails the main office building at the South Henderson mill.

"A Molotov Cocktail is fuel oil and gasoline mixed in a bottle and corked up with a fuse on the outside. When it bursts against something it ignites the gas. I asked him could he fix them up. He said he could."

That meeting, according to the witness Aaron, lasted about an hour. Arrangements were then made for a meeting at the motel the following night. Aaron continued: "He did meet me the following night at the Brookwood Motel, Warren Walker, Pegram, Abbott and Jarrell and myself. . . .When they first got in my presence in my room, one of them was introduced to me as Mike Jarrell and Abbott and Pegram said they were the Jones boys and said that was as much as I would ever know. . . .Walker told me that these were the boys that he had told me about previously and said that Pegram and Abbott would bomb the transformers. And Pegram asked me about the price, what he would get out of it. I told him that I didn't know, but the understanding that I had was that the pay-off would come from

Leaksville, and he said that he had discussed it with Gore and Gore and him had come to some agreement. He did not tell me what it was, and Pegram said that if they had paid the price, he could have knocked that office building out long ago, but that they would not pay the price for it. . . .I told Jarrell that Pegram was running his mouth too much and Jarrell agreed with me. . . .Walker said he could vouch for Punch referring to Pegram, and the other two boys said that he knew how they operated and said that they were good boys. . . .Walker and I said that we would bomb the boiler room if we could. . .Pegram told me, 'If you show me exactly where to put it, it will go out,' referring to the lights. By 'it' was meant dynamite. He wanted me to show him where to put the dynamite under the transformers. . . .We talked of the best time to engage in those activities, me and walker, and I asked him was the mill in operation on Saturday and Sunday and he said that — Pegram said that he thought it would be the best night to do it. . . ."

Arrangements were made to meet again at the Brookwood Motel on 12 June. Aaron testified that Walker, Abbott, and Pegram came to the motel. Pegram did not get out of the car but Walker did and came to his room. Pegram and Abbott left in their car. Walker remained with the witness. Aaron testified that it was arranged that they would meet on the night of the 13th at the Motor Freight Terminal in Henderson to consummate the conspiracy. Aaron quoted Pegram as saying: " 'I will drive my brother's car' or 'I will have my brother's car.' He said that he would have the stuff with him, talking about the dynamite. Pegram himself said that he had the 60% dynamite stuff he would use on the power plant. Walker said he would get out of the car. He did not say whose car he would drive up in but said he would get out of the car and get in with me. . ."

Special agents and members of the Highway Patrol, pursuant to the information communicated to them by Aaron, were at the Motor Freight Terminal in Henderson on the night of the 13th. About 7:50 that night an automobile drove up with three persons in it, the defendants Walker, Pegram, and Abbott. They were arrested and interrogated by members of the S. B. I. The tape recordings taken at Aaron's room in the Brookwood Motel were played to them. Witnesses for the State testified Walker and Abbott admitted the agreement to dynamite as related by Aaron but asserted they had not intended to go through with the plan. They testified Pegram admitted going to Roanoke Rapids with Walker, Abbott, and Jarrell where they talked with another person; but Pegram refused to make any further statement.

The additional evidence on which the State relies to support the verdict of guilty as to defendant Boyd Payton may be thus summarized: Auslander is a staff representative of the Textile Workers Union of America, AFL-CIO. The proposal to dynamite the mill properties and electric system originated with Auslander to prevent the failure of the strike by union members, employees of the Cotton Mill. Aaron, soon after he went to Henderson pursuant to his agreement with Auslander, was contacted by defendant Lawrence Gore, likewise a staff representative of the Textile Workers Union of America. Payton was the union agent having charge of the strike at Henderson. Gore was his subordinate. It was important that union association should not be established if the plan went awry. Gore was registered at the Vance Hotel in Henderson during the early part of June. He was there on the night of 4 June and checked out on 5 June. Gore promised the men employed to assist in dynamiting would meet Aaron at his motel room on the night of 4 June. They failed to appear. Aaron, when they failed to appear, called for Gore at his hotel room in Henderson. A person answered stating that the defendant Payton was talking. Aaron recognized Payton's voice. This sufficed to take the question of identity to the jury. *Everette v. Lumber Co.*, 250 N.C. 688, 110 S.E. 2d 288.

Supporting Aaron's testimony were telephone company records showing a long distance call for Gore at the Vance Hotel in Henderson. The call lasted two minutes 25 seconds. It was made at 8:36 p.m. Payton answered the phone in Gore's room. Aaron continued: "He said this is Boyd Payton, and I said that this is the boy from Leakesville at Roanoke Rapids. He said, I know, and I told him that I was broke and had to go home. My wife thought I was in Richmond and I had to go home that week-end. I told him I was upset because Gore had not met me that night he was supposed to, Walker was supposed to. He says, don't say too much. He says the phones are going through a switchboard. He said that Lawrence was out of town but he would contact him that night or the first thing in the morning and get him to get in touch with me and he hung up. That's all."

The brief of defendants, dealing specifically with the sufficiency of the evidence as to Payton's guilt, says with respect to the quoted conversation between Payton and Aaron: "The jury conceivably could infer from this testimony that the defendant, Payton, knew about the alleged conspiracy involving the other defendants." With this knowledge Payton promised to have Gore see Aaron.

The following morning Aaron had breakfast at a restaurant next to the bus station at Roanoke Rapids. When he returned to the

motel, Lawrence Gore and Warren Walker were waiting for him. Aaron was asked: "What was said then and there?" He testified: "The first thing was said, Mr. Gore said that Boyd had finally got in touch with Charlie. . .he said that Boyd had finally got in touch with Charlie Auslander, Boyd Payton, and said that he had got in touch with Charlie himself the night previous to the meeting we had that morning and said that Auslander wanted me to come home to discuss the situation over further. . . .Gore told me, he said, 'I thought we had an understanding that we would not get in touch with each other again,' and he did not like the idea that I called the hotel. He said he did not like it and said Boyd did not like it, me calling the Vance Hotel and talking to Payton. I told him I called the hotel to talk to him, Gore. And I said I did not ask to talk to Payton and we discussed that. I just explained to him that I did not know that I was going to talk to Payton and I did not ask for Payton, they done it on his own free will. . .He (Gore) said he was moving from Whiteville to Greensboro and he needed every penny he had and said he could give me $20.00. He gave me $20.00. He said, 'Here's $20.00,' and he says, 'When you get home tell Charlie to send it back to Boyd and Boyd can give it to me.' "

Payton carried a telephone credit card issued to "Boyd E. Payton, Textile Workers Union of America, C. I. O., 110 West 6th Street, Charlotte, N. C." A representative of the telephone company produced, pursuant to subpoena, records showing charges to the credit card. Among the charges to that card was a telephone call made at Henderson to Auslander at his residence in Reidsville. The call was made at 11:21 p.m. 4 June and lasted eight minutes. Other calls to Auslander in May and June were charged to Payton's credit card.

Aaron returned to Leaksville on the morning of 5 June. He testified: "I saw Auslander when I got to Leaksville. He was standing outside. I was waiting for him when he came up. I saw him the same day and he drove up and we walked over behind my car and we talked, Auslander and me. As to what he said then, what was the first thing, well, he got mad because I had called Payton. He told me I was wrong by calling him and getting him involved in anything, getting Payton involved. He said I should not have talked to him. I explained to him that I did not call him and he talked to me voluntarily. . ." This was the time Auslander telephoned Spartanburg to secure dynamite.

The evidence is, we think, sufficient to show Payton's participation in the proposed plan to dynamite the properties of the Cotton Mill and the Power Company, conceived for the purpose of pro-

moting Payton's job of keeping the mills from operating and is sufficient, if accepted by a jury as true, to establish the guilt of all of the defendants.

Defendants argue there can be no conviction because of Aaron's pretended participation. Their position is that the evidence establishes that Aaron never had any intent to consummate his agreement with Auslander; that agreement constitutes the basis on which the conspiracy must rest, and that since there was no consent to the conspiracy by Aaron, the agreement by the others was a nullity and constituted no crime.

In support of their position they rely on *King v. State*, 104 S 2d 730. There the defendant King and another were charged with having entered into a conspiracy with a law enforcement officer to violate the gambling laws of Florida. They were convicted; judgment was originally affirmed. Petition to rehear was filed, and by a divided Court it was held that the conviction could not be sustained where one of the parties to the conspiracy was a law enforcement officer who had no intent to violate the law. The Court said: "But Muscovitz, in the circumstances here, is not criminally liable as a co-conspirator (citations omitted); nor can it be seriously contended that a government agent can be prosecuted for a violation of a criminal statute committed in the performance of his duty as such agent. We are cognizant of the fact that a punishable conspiracy may exist whether or not the crime intended to be accomplished by it was committed. But it is equally well settled that where one of two persons who conspire to do an illegal act is an officer acting in the discharge of his duty, the other person cannot be convicted of a charge of conspiracy."

If the Supreme Court of Florida was speaking with reference to a conspiracy limited to a governmental agent and one other person, the facts differ from the facts in this case. If the Supreme Court of Florida intended to hold that a conspiracy among several, one of whom was a governmental agent, without any intent to participate but merely seeking information with respect to the proposed criminal act, we disagree with the conclusion reached. The mere fact that an agent of the law pretends to be acting in conjunction with several others in a criminal conspiracy does not absolve those indicted and relieve them of guilt. We so held in *S. v. Caldwell*, 249 N.C. 56, 105 S.E. 2d 189.

The cases cited by the Supreme Court of Florida do not, in our opinion, support the conclusion reached in the *King* case.

In *De Mayo v. United States*, 32 F. 2d 472, there was a charge of criminal conspiracy and as here a government agent was, or pre-

tended to be, a party to the conspiracy. The indictment charged several as participants in the conspiracy. The Court said: "It developed in the testimony that Kelsey, together with one Kennedy, was acting as the representative and agent of the prohibition officers of the United States; that he was in effect such an officer and did what he did for the purpose of detecting the conspirators and of bringing them to trial and conviction. It is urged, therefore, by appellant that the indictment, if not in fact invalid because of the incorporation of Kelsey as conspirator, failed of support by the evidence in that a government officer, who is not in fact a co-conspirator, but who acts simply for the purpose of detecting crime, cannot bind his codefendants; that his acts are not imputable to them because there is not community of purpose. . . . (I)t seems clear that if, in addition to the parties first named, Kelsey, though not a government officer, had been included as a defendant, and it had developed that Kelsey was not a party to the conspiracy, it could not be claimed that the conspiracy charged would fail on that account as to the others. We take it that Kelsey's incompetency to become a conspirator under the facts existing effects a result no different from that which would follow if he were otherwise found not to be a party to the unlawful agreement."

*O'Brien v. United States,* 51 F. 2d 674, involved a conspiracy to violate the prohibition laws. The court said: "That there was a conspiracy to violate the prohibition law, there can be no doubt. The conspiracy was conceived by the three prohibition agents, who enlisted the services of a decoy, Lyle, to more effectually accomplish their object. . . . It might be urged, perhaps, that the object of the conspiracy was to entrap certain suspected offenders. Nevertheless such entrapment was to be accomplished through the violation of the Prohibition Act. As a conspiracy may have several objects, if follows that, if one of its objects be the violation of a federal law, it falls within the condemnation of the statutes."

In *Weathered v. State,* 81 S.W. 2d 91 (Texas), the bill charged Weathered, Vick Bradley, and Edgar Hammonds with a conspiracy to break and enter a house. The court reviewed the evidence as to Bradley's intent to participate in the conspiracy and his part as an informer. Following the review of the evidence, the Court said: "From the foregoing testimony it is obvious that Vick Bradley did not intend to commit burglary or aid in the commission thereof. His participation in the alleged conspiracy was not sincere; it was simulated. Hence, there was no union or meeting of the minds on the part of Bradley with the other parties so as to constitute him a coconspirator. His acts, conduct, and presence was to deceive

and mislead his alleged coconspirators. His mind did not concur and unite with the minds of his alleged coconspirators in a criminal intent to commit the alleged offense. . . . But this would not relieve the appellant from being prosecuted and convicted of said offense provided the testimony showed that appellant and Hammonds had entered into a conspiracy to commit the offense. . ."

Applying the definition heretofore given of a conspiracy, this Court has held that one cannot be convicted unless at least two are so charged. *S. v. Wrenn,* 198 N.C. 260, 151 S.E. 261. But when, as here, several are charged and participate in the conspiracy, conviction can be had; and this is true even though some of the alleged conspirators are unknown. *Rogers v. U. S.,* 340 U.S. 367, 95 L. ed. 344, 19 A.L.R. 2d 378.

Defendants next challenge the right to put them on trial. The bills of indictment were returned at the June Term. Before pleading to the charge contained in bill 3508, they filed what they denominated a plea in abatement. By this plea they assert (1) Vance County was not the proper venue, (2) the bill was based solely on incompetent evidence, which fact they propose to establish by testimony of members of the grand jury, and (3) the bill was not based on any evidence given in connection therewith. Such testimony as was heard related to a prior bill, and they propose to establish this fact by testimony from members of the grand jury.

The evidence taken at the trial establishes contact between Martin and Walker and activities between them in Vance County. It is also fair to infer that Walker, Abbott, and Pegram came to the Motor Freight Terminal in Henderson on the night of 13 June to consummate the conspiracy by dynamiting the buildings. Trial was properly had in Vance County, *S. v. Warren,* 227 N.C. 380, 42 S.E. 2d 350; *S. v. Lea,* 203 N.C. 13, 164 S.E. 737.

The bills show that L. E. Allen, C. D. Fentress, and W. C. Wilson testified before the grand jury. The evidence at the trial shows these witnesses are members of the S. B. I. Wilson and Fentress testified at the trial. They related confessions made by Walker, Jarrell, Pegram, and Abbott. Allen did not testify at the trial. The court refused to permit defendants to examine members of the grand jury to determine what evidence they heard to induce them to return a true bill. The court ruled correctly. *S. v. Blanton,* 227 N.C. 517, 42 S.E. 2d 663; *S. v. Levy,* 200 N.C. 586, 158 S.E. 94; *S. v. Broughton,* 29 N.C. 96; *S. v. Ernster,* 179 N.W. 640; *S. v. Lewis,* 38 La. Ann. 680; 27 Am. Jur. 720. The reason for the holding is aptly expressed by *Adams, J.,* in *S. v. Levy, supra:* "The suggested practice would hinder the trial and result in useless delay. It would often require the ex-

amination of a number of witnesses, including, perchance, members of the grand jury; it would demand of the judge that he invade the province of the grand jury or exercise the functions of a petit jury finding the facts from conflicting evidence and passing upon the credibility of witnesses; it would turn the Superior Court into a forum for an unseemly contest between members of the grand jury and those whom they may have charged with crime. Besides, such practice is unnecessary; if the evidence is incompetent it will be excluded by the trial court."

Even if the court had ruled erroneously on the motion relating to one bill of indictment, such ruling could not avail defendants on this appeal. They have been convicted and sentenced on three bills. The sentences are identical and run concurrently. Error would have to appear as to all three to be prejudicial. *S. v. Thomas,* 244 N.C. 212, 93 S.E. 2d 63; *S. v. Williamson,* 238 N.C. 652, 78 S.E. 2d 763; *S. v. Hicks,* 233 N.C. 511, 64 S.E. 2d 871.

Motions to quash after the evidence was in and motions to nonsuit had been overruled came too late. *S. v. Williamson,* 250 N.C. 204; *S. v. Gales,* 240 N.C. 319, 82 S.E. 2d 80; *S. v. Suddreth,* 223 N.C. 610, 27 S.E. 2d 623.

Defendants next assert their rights were prejudiced by permitting the witness Aaron, on redirect examination, to explain why he had communicated with the president of the mill and law enforcement officers with respect to Auslander's proposal and the witness's subsequent trips to Henderson. He had been subjected to rigorous cross-examination. It was in evidence that he had been convicted of several criminal acts. He was out of work. At least a portion of his expense in Henderson and Roanoke Rapids was paid by the S. B. I. Enmity on Aaron's part to Auslander was claimed. These facts would support an argument that Aaron was prompted to testify because of his hate for Auslander or from mercenary motives. Either would render his testimony of dubious value. His unworthiness of belief was strongly argued before us. Manifestly it was competent in that situation for Aaron to explain his reason for communicating with the officers. The evidence was intended only to repel defendants' attack on the witness's credibility. It was competent. Stansbury, N. C. Evidence, sec. 50 and 51.

Defendants contend their rights have been prejudiced by improper argument made by one of the prosecuting attorneys. These assignments are not based on exceptions taken at the trial. Notwithstanding this failure of defendants to take exceptions, we consider the assignments. During the argument of Mr. Hooks defendants asked the court to permit the jury to retire. Their request was allowed. The

record shows: "The defendants then objected to the following state-
ment they say was made by Mr. Hooks: 'No one has gone on the
stand to testify as to Aaron's discredibility, on behalf of the defend-
ants, except the lawyers.'

"COURT: Is that the statement you made.

"MR. HOOKS: Substantially, yes, sir. I said, 'Nobody has testi-
fied to anything except the lawyers in this case contradicting what
this witness has said.'"

Defendants thereupon moved for a mistrial which was denied. De-
fendants assert the argument was improper and forbidden by the
statute, G.S. 8-54, because the defendants had not elected to testify.
They offered no evidence. Defendants' contention is not well found-
ed. To correctly interpret and apply the statute, it should be re-
membered that at common law, both in England and in this coun-
try, parties were not competent witnesses and were not permitted
to testify. Relaxation of this rigorous rule began in England early
in the administration of Queen Victoria when so much remedial legis-
lation was adopted. North Carolina shortly thereafter modified the
law of exclusion, c. 23, Laws 1856-57, but it was not until 1881 when
the privilege now accorded to a defendant in criminal actions to testi-
fy or to remain mute without creating a presumption against him
was enacted. *S. v. Wilcox,* 206 N.C. 691, 175 S.E. 122.

An admission of guilt by defendant was competent evidence prior
to 1881 just as it is competent today. Then as now the law applied
and gave effect to the assumption that one charged with crime and
wrongful conduct would not remain silent when he had an oppor-
tunity to speak. Such silence was evidence of guilt. *S. v. Crockett,* 82
N.C. 599; *S. v. Bryant,* 235 N.C. 420, 70 S.E. 2d 186.

Counsel should base their argument on the evidence and the fair
inferences which may be drawn therefrom. Guilt must be ascer-
tained from the evidence. *S. v. Roach,* 248 N.C. 63, 102 S.E. 2d 413;
*S. v. Roberts,* 243 N.C. 619, 91 S.E. 2d 589; *Cuthrell v. Greene,* 229
N.C. 475, 50 S.E. 2d 525; *S. v. Little,* 228 N.C. 417, 45 S.E. 2d 542.

Since the admission of guilt by failure to deny a charge of crime
is evidence of guilt, a solicitor may properly so argue. In 1881 when
the barrier was removed, preventing the accused from testifying and
according him a privilege, it was proper to provide that his failure
to utilize the privilege so given should not be regarded as an im-
plied admission. Hence the language used by the Legislature, G.S.
8-54, "his failure to make such request shall not create any pre-
sumption against him," was entirely proper.

But the remark to which the objection is made does not specific-
ally point to the failure of the defendants to take the stand. It does

not argue any admission of guilt by them because of such failure. The argument must be viewed in the light of the evidence. Aaron, the principal witness for the State, had been sharply cross-examined. We may assume that the defendants in their argument to the jury had challenged his credibility. He had testified that at the inception of the conspiracy four were present: Auslander, in whose mind the crime originated, the witness Aaron, Auslander's assistant, Dave Harris, and E. C. McBryde. So far as appears, neither Harris nor McBryde took part in the conspiracy.

They were merely silent observers. If Aaron's testimony with respect to the very inception of the conspiracy was false, the whole case would fall. It was not improper for the solicitor in this situation to say that no one had testified in contradiction of Aaron. S. v. Hooker, 145 N.C. 581; S. v. Weddington, 103 N.C. 364.

At the request of defendants the court reporter took the remainder of Mr. Hooks' argument. Defendants now assign other portions of his argument as error entitling them to a new trial. No objection was made at the time. The portions assigned as error are, when tested by correct legal principles, not improper and form no basis for a mistrial. The court in its charge was careful to inform the jury that the defendants had a right to elect whether they would or would not testify and that their failure to do so should not be considered by the jury against them or to their prejudice as they were exercising a right given by law.

By assignments of error 35, 36, 133, 116, 96, 97, 98, 37, 51, 152, and 121-132 defendants assert that they have not had a fair and impartial trial which the law guarantees to every defendant.

It would seem needless to say that every person charged with crime is, when placed on trial in the courts of North Carolina, entitled to a fair and impartial trial. We have repeatedly so declared. S. v. Grayson, 239 N.C. 453, 80 S.E. 2d 387; S. v. Phillips, 240 N.C. 516, 82 S.E. 2d 562, and numerous cases there cited. If, as defendants contend, they have not had a fair and impartial trial, the judgment directing their imprisonment ought to and would be vacated and a new trial ordered.

We have already dealt at length with most of defendants' contentions. Perhaps the opinion is already unduly protracted, but the mere assertion that a defendant has been deprived of a fair trial requires discussion. For that purpose we pick the assignments which seem to typify the basis for the assertion. The contention is that the prosecutor sought to introduce in the trial evidence of other crimes for the purpose of influencing the jury. It is quite true, as defendants argue, that evidence of crime committed by a defendant

totally unrelated to the crime with which he is charged is immaterial and hence should not be offered. In applying this general rule the court excluded evidence and directed the jury not to consider evidence which seems to us to have been competent. The rulings by the court were not prejudicial but favorable to defendants. Of course the State had no right to except to these rulings which we think unnecessarily limited the evidence on which the State was entitled to rely. We pick as typical of the assignments relied upon numbers 35, 36, and 51.

The S. B. I. agent, Wilson, testified as to the statements made by Walker and the other defendants on the night of their arrest. The witness was relating the statement of Walker when he was asked: "What else did he tell you?

"I asked Walker what he told the man at Roanoke Rapids about him furnishing all of the dynamite in the violence of Henderson—

"Objection. . .

"WITNESS (continuing): Walker said he told the man that he had supplied all of the dynamite . . .

"Motion to strike the answer on the ground it attempts to connect Walker with other crimes with which he is not here charged.

"SUSTAINED. You will not consider his answer, gentlemen. Dismiss it from your minds."

Thereupon a motion for mistrial was made. The jury was permitted to retire. When the jury returned, "The Court Reporter, at the request of Mr. Hooks, repeats the last statement of the witness Wilson. Defendants move for a mistrial on the ground of repetition of that highly prejudicial statement.

"COURT: You will not consider anything about that question or the answer thereto, gentlemen. Dismiss it.

"Q What else was said by Walker?

"A And that he fixed the bombs and carried them to the person who used them . . .

"Objection — Sustained.

"COURT: You will not consider the answer to the question. Dismiss it from your minds.

"DEFENDANTS MOVE FOR A MISTRIAL. DENIED.

"Walker said that although he told the man this, that this was not true, that he was only bragging to him." The foregoing portion of the record constitutes assignments 35 and 36.

Aaron testified that at the conference at the motel in Roanoke Rapids with Pegram, Walker, and others, there was discussion as to how to effectively destroy the transformers and electric lines furnishing power to Harriet Cotton Mills. It may be assumed from the testimony that the Power Company had several transformers at its

substation. It was necessary to ascertain which transformer should be destroyed to prevent the transmission of power. Aaron testified: "Pegram said that he did not think that if we knocked that transformer out that it would knock out the lights at both mills and I told him we were not interested in the North Henderson mill and then there was a lot of discussion about where the power came from feeding the South Henderson mill.

"Q What was said about that?

"A Pegram said it come from Greystone. He said, 'The reason I know, you remember when I throwed the cap . . .'

"Objection by the defendants.

"COURT: Objection overruled.

EXCEPTION BY DEFENDANTS    EXCEPTION #45.

"WITNESS (continuing): He said the reason he knew it come from Greystone, he said that when he threw the cowchain across the high-tension wires and he looked at Robert and he says, 'Don't you know, Robert, when we knocked the lights out at the North Henderson plant?' And he says, 'The South Henderson plant did not go out.

"Objection (by the defendants) and motion to strike.

"COURT: Motion allowed. You will not consider his answer, gentlemen; dismiss it from your minds."

The testimony objected to relates to crimes distinct from the criminal charge then being heard, but it must be remembered that the State did not offer to prove the truth of the statements made by Walker and Pegram. The competency of the evidence rests upon their assertion that their experience and knowledge made them ideally fitted to confederate and become conspirators and follow the leadership of Aaron. It was immaterial whether the lights had gone out at two Henderson mills because of wrongful conduct by someone with the transformers. It was material that Pegram claimed to know which transformers had been destroyed. The State did not seek to show that Walker had in fact furnished the dynamite for other violence in Henderson. It sought to show, and it was competent for it to show that Walker, professing his skill and ability to accomplish the purpose of the conspiracy, should boastfully make such a claim. Since the evidence was competent even though excluded, it necessarily follows that no prejudice arose by the insistence of the prosecutor in presenting it to the jury. *S. v. McClain,* 240 N.C. 171, 81 S.E. 2d 364, and authorities there cited.

As previously noted, a tape recorder was placed in Aaron's motel room with his consent and was so placed for the purpose of recording conversations among the conspirators. Evidence so obtained was, as to those engaged in the conversations, not incompetent. *Irvine v. Cal-*

*ifornia,* 347 U.S. 128, 98 L. Ed. 561. The solicitor had the S. B. I. agent who installed it show how the machine operated. This testimony was objected to and forms the basis of assignments 121-132. Since the evidence there obtained was competent as to the participants, it was competent to demonstrate or explain how the machine operated. Perhaps some of the jurors had never seen such a machine in operation.

After the witness had explained its operation, the solicitor offered the recordings in evidence. When he offered the recordings he frankly said to the court: "I have heard those recordings. In my opinion they contain matters that are not entirely competent in the evidence in this case because of their relation to other matters. We offer here the tapes and the recordings. We offer them for use by the defendants, if they desire, and we offer them in evidence in corroboration of the witnesses in this case who have testified about those matters."

Defendants objected to the use of the tapes and moved for a mistrial, "on the grounds of the Solicitor's statements in the presence of the Jury to his Honor and on the grounds the Solicitor has tried to take unfair advantage of the defendants by putting the defendants on a spot." The court sustained the objection. Defendants moved for a mistrial. This motion was denied.

Defendants argue the offering of these tape recordings was so unfair as to demonstrate a deliberate intent on the part of the prosecutor to prejudice them and prevent a fair trial. This contention must be weighed in the light of the testimony and the rulings which the court had made. When the recording was played to defendant Pegram, he recognized his voice, but is quoted as saying the recording "sounded like a bunch of drunks playing poker." Manifestly, defendants intended to challenge the accuracy of the recording which, according to the State, caused Walker, Abbott, and Jarrell to confess their participation and Pegram to refuse to deny the charge of conspiracy.

The court, on objection by defendants, had excluded declarations made by some of the defendants for the purpose of showing their fitness for their part in the conspiracy. As previously stated, this evidence was competent against the speaker even though it related to other crimes. This was apparently the view which the solicitor took when he offered the evidence. Unlike defendants, an exception to an erroneous ruling would not avail him.

The tape recording played an important part in the trial of the case. If the solicitor had not offered it, defendants could charge unfairness in withholding evidence. He could not well answer that he did not offer it because it contained statements which he thought the court would deem incompetent. In the situation confronting him

he did the proper thing. He offered it in evidence and told the court that he thought the court would hold parts of it incompetent. He made it available to the defendants. We find nothing in this record to impugn his motives.

It is the duty of the trial judge to supervise the trial of cases and to control counsel so that the parties may be assured of a fair and impartial trial. Here the trial court manifestly concluded that the accusation made by defendants found no support in fact. The record indicates that counsel for defendants, as well as counsel for the State, diligently sought to perform their respective duties. It may be that at times each was over zealous. It is true that the court on occasion had to admonish counsel, but we find nothing from our examination of the record which leaves the impression that the defendants were not afforded a fair and impartial trial.

We have carefully examined each exception and each assignment of error. We find nothing which in our opinion would justify another trial as to any defendant.

No error.

HIGGINS, J., took no part in the consideration or decision of this case.

BOBBITT, J., dissenting as to defendant Payton. In my opinion, the evidence, when considered in the light most favorable to the State, is insufficient to show that defendant Payton was a party *to the conspiracies charged in the bills of indictment.*

"The existence of a conspiracy may not be established by the *ex parte* declaration of an alleged conspirator made in the absence of his alleged coconspirator. Only evidence of the acts committed and declarations made by one of the coconspirators after the conspiracy is formed is competent against all, and then only when the declarations are made or the acts are committed in furtherance of the conspiracy." *S. v. Benson,* 234 N.C. 263, 66 S.E. 2d 893, and cases cited.

Upon this legal principle, Aaron's testimony as to what Gore and Auslander *said* (in Payton's absence) Payton *had said* was not competent to establish that Payton was a party to the alleged conspiracies. Hence, I do not discuss the dubious probative significance of this portion of Aaron's testimony.

The competent evidence is sufficient to establish these findings: (1) Aaron, endeavoring to contact Gore, had a telephone conversation with Payton, and Payton gave Gore Aaron's message; (2) after his telephone conversation with Aaron, Payton telephoned Auslander, with whom Payton was in contact from time to time; and (3) Payton knew Auslander had sent Aaron to the Henderson area *for some purpose* incident to the strike.

The crucial question is whether the circumstantial evidence is such that logical and legitimate inferences may be drawn therefrom to support the factual conclusion that Payton was a party to the alleged conspiracies. See *S. v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431. In my opinion, the correct answer is, "No." However strong the suspicion, it seems to me that supposition and conjecture must be invoked to reach such factual conclusion.

Of course, if we could assume that Payton then knew the facts disclosed by the evidence now before us, there would be no doubt as to the sufficiency of the evidence as to him. But there is *no evidence* that he had such knowledge at the time of his telephone conversations with Aaron and with Auslander.

Activities incident to the strike were many and varied. Conceding the sufficiency of the evidence to support a finding that Payton knew Aaron had been sent by Auslander to the Henderson area *for some purpose* incident to the strike, Payton's guilt or innocence depends upon whether he had knowledge of and was a party *to the (particular) conspiracies alleged in the bills of indictment.* In my view, *the evidence, as to Payton, is insufficient to support the verdict.*